*260 OPINION.
Smith:
The points in issue will be discussed in the order of the. findings of fact.
1. Tramportation for Investment-Or. — In its original income-tax return for 1917 the petitioner claimed a deduction from gross income for ordinary and necessary expenses of $59,403,357.05. It filed an amended return for that year in which it increased the deduction for expenses by the amount of $6,307.30, representing the refunds made under the Minnesota rate case decision, making the amount claimed $59,409,664.35. Included in this amount was $422,677.80 which stood upon its books as a credit to the account “ Transportation for Investment-Cr.” It now claims that the correct amount of its deduction for expenses is $59,367,864.90 or $41,799.45 less than the amount claimed upon its original return, said $41,799.45 repre *261 senting in its opinion the correct credit to “ Transportation for Investment-Cr.”
The petitioner’s books of account for the year 1917 were kept in accordance with the uniform system of accounts prescribed by the Interstate Commerce Commission. Under the provisions of such system of accounts railroad companies are permitted to charge to construction cost a reasonable allowance for the cost of transporting men and materials for construction projects over their own lines in transportation service trains. The Interstate Commerce Commission does not fix the amount which may thus be charged to construction but merely places a maximum limit thereon. Such maximum limit is one per cent per man mile for employees and six mills per ton mile for materials. In keeping its books of account for 1917 the petitioner made the maximum charge permitted by the Interstate Commerce Commission and in effect capitalized $422,677.80 as the cost of transporting men and materials engaged in construction work on its revenue trains. It here contends that at the time the charge was made the petitioner had not made an exact determination of cost of such charge and that such cost should have been computed at $41,799.45 instead of at $422,677.80 and that the respondent erred in disallowing the deduction from gross income of the difference between these two amounts, or $380,878.35.
The petitioner’s general manager, a man with 32 years’ experience in petitioner’s operating department, testified that men are transported to construction work on the ordinary passenger trains; that no extra trains are run or extra cars put on to carry them; that no extra service is performed for them; that during the year 1917 the men so transported were equal to 3,220,609 men transported one mile; that they averaged approximately 1 man to every 4 passenger trains and constituted approximately .48 of 1 per cent of the total passengers carried on such trains; that at all times many more passengers could have been carried on such trains without increasing the number of trains or cars run. The witness testified that in his opinion the operating expenses of the petitioner would not have been reduced if these men had not been carried on these passenger trains. He also testified that company material, including construction material, was transported in such a way as not to require the use of additional trains; that a great deal of it was transported by local way-freights and branch-line trains which usually ran with light tonnage; that the company controlled movement of construction material so as to move it on trains that did not have full tonnage; that construction material for a given job was accumulated from time to time at a station near the job until a sufficient quantity had been received to justify putting on a work train by which the material was transported to the place where it *262 was to be used; that the entire cost of the work train was then charged to the job. He also testified that the prevailing tonnage on petitioner’s line of railroad was east-bound and that empty cars had to be used west-bound at all times of the year to supply sufficient cars for east-bound traffic; that in the case of construction material moved west-bound the only extra service performed was the haul of the material itself as the cars would otherwise be moving light; that no extra service was performed in the handling of construction material ; that the material was usually loaded by the firm from which it was bought, or, if loaded by the petitioner’s employees, the work was done by store department men whose time was not charged to operating expenses; that the material was also unloaded by store department employees; that during the year 1917 construction material equivalent to 65,076,416 tons moved one mile was transported in the ordinary commercial trains of the petitioner; that this material was carried in small amounts at various times during the year; that it averaged 5% tons per train and constituted .67 of 1 per cent of the total tonnage of freight carried by the petitioner during the year. He stated that it was his opinion that if such construction material had not been transported by the petitioner during the year 1917 the cost of maintenance of way or maintenance of equipment would not have been reduced, except in the case of repairs to freight cars. In connection with repairs to freight cars he stated that it was his opinion that 60 per cent of such repairs varied with the volume of traffic and 40 per cent was due to weather conditions and natural deterioration; also that if such construction material had not been moved, traffic expenses, the cost of operating dining cars, hotels, stock yards, etc., and the general expenses of the company such as salaries of its general officers, accounting department expense, etc., would not be changed; that the only items of expense classified as transportation expenses which would be affected would be fuel for yard locomotives and fuel for train locomotives.
Upon the basis of the testimony given by petitioner’s general manager, a cost analyst, with twelve years’ experience in railroad work, testified that the operating expenses of the petitioner for the year 1917 had been increased not more than $41,799.45 by the transportation of employes engaged in and construction material used in additions and improvements in transportation service trains. The method of the computation is detailed and no useful purpose would be served by setting it forth here, except that is should be noted that in the determination of the revised estimate only freight-car repairs, fuel for yard locomotives, -water for yard locomotives; fuel for train locomotives and water for train locomotives and train power produced have been taken into consideration.
*263 The classification accounts prescribed by the Interstate Commerce Commission permit the petitioner to charge to capital “ a fair allowance representing the expense to the carrier of such transportation in transportation service trains over the carrier’s own line.” The petitioner’s operating expenses claimed as a deduction from gross income were $422,671.80 in excess of the amount shown as its operating expenses in returns made to the Interstate Commerce Commission. The petitioner now admits that $41,799.45 of the $422,677.80 was properly disallowed as a deduction from gross income by the respondent. We think that the evidence does not show that any part of the $422,677.80 was a proper deduction from gross income. That amount was the estimate made by the petitioner of the portion of its operating expenses which should be charged to capital when it made up its accounts for 1917. Apparently in the making of that estimate other cost factors were taken into consideration in addition to those used in computing the revised estimate of $41,799.45. The latter figure has been computed upon the basis of the additional cost to the petitioner of transporting men and materials engaged in and used in construction work, but the account “ Transportation for Investment — Cr.” does not apparently have reference entirely to the additional cost to the petitioner of transporting men and materials so engaged. In our opinion, a part of the wear and tear of the train equipment of the rails, ties, etc., may be properly capitalized when men and materials for construction work are transported in transportation service trains. The evidence adduced does not convince us that the real cost to the petitioner of this transportation is the amount of $41,799.45. The disallowance of the deduction of $422,677.80 is therefore approved.
2. Federal fines paid by petitions for 1917 and Federal fmes paid by Great Northern Express Co., an affiliated company, for 1918.— This issue relates to the deductibility from gross income of amounts paid as fines or penalties for violation of certain Federal regulatory statutes. The petitioner claims the deduction of these amounts as ordinary and necessary expenses. The respondent has disallowed the deduction of these amounts,
The amounts claimed as deductions for the year 1917 are as follows:
Violation of Safety Appliance Acts_$3, 388.17
Violation Honrs of Service Act_ 517. 63
Violation of 28-Hour Live Stock Act_ • 536. 22
Violation of customs regulations- 145.00
4, 587. 02
The amount of the disallowance for the year 1918 is $14, which represents one-half of a penalty paid by the Great Northern Express Co., an affiliated corporation, for a violation of a customs regulation *264 by the Adams Express Co. The Great Northern Express Co. contributed one-half of the penalty because of the difficulty of ascertaining which company was at fault.
The Safety Appliance Acts consist of an act passed March 2, 1893, with various amendments, making it unlawful for a railway company to operate cars or locomotives with certain specified defects over its line. (27 Stat. 581; 29 Stat. 85; 32 Stat. 943; 36 Stat. 298; 36 Stat. 1397.) The provisions of the Acts with respect to the beginning of the time of enforcement after the enactment are liberal.
The Hours of Service Act was an act passed March 4, 1907, and amended May 4, 1916, making it unlawful for a railroad company to employ telegraph operators, enginemen, trainmen or switchmen more than a given number of hours without rest. (34 Stat. 1415; 39 Stat 61.) The Act contains the liberal proviso that it does not apply:
* * * In any ease of casualty or unavoidable accident or the act of God; nor where the delay was the result of causes not known to the carrier or its office or agent in charge of such employee at the time the said employee left a terminal which could not have been foreseen.
The 28-Hour Live Stock Act (34 Stat. 607) was an act passed June 29, 1906, making it unlawful for railway companies to confine live stock in cars more than 28 hours without unloading them for feed and rest, unless the shipper gave his written consent, in which case they could be confined for 36 hours without being given an opportunity to obtain feed and rest. The act contains a proviso that the penalty or fines shall not be imposed if the carrier is prevented by storm or other accident or unavoidable causes which could not be anticipated or avoided by the exercise of due diligence and foresight.
We think that all the operating expenses of a railroad company must ordinarily be regarded as “ordinary and necessary expenses” and deductible from gross income. We note, however, that the Interstate Commerce Commission has not classified fines of the character of those paid by the petitioner as operating expenses. They are required to be recorded in account No. 621, “ Miscellaneous Debits.” It is provided that this account “ shall include amounts, not provided for elsewhere, chargeable to Profit and Loss from other accounts, amounts written off in consequence of adjustment, and payments not properly chargeable to the income accounts. * * * Among items which shall be charged to this account are * * * Penalties and fines for violation of the Act to Regulate Commerce, or other Federal laws, but not specifically provided for elsewhere.”
Payments of the fines above indicated do not constitute operating expenses under the classification of accounts of the Interstate Commerce Commission. We are of the opinion that they do not constitute *265 ordinary and necessary expenses deductible from gross income in income-tax returns. Cf. Sarah, Backer et al., Executors, 1 B. T. A. 214; Norvin R. Lindheim, 2 B. T. A. 229; John Stephens, 2 B. T. A. 724; Columbus Bread Co., 4 B. T. A. 1126.
3. Interest due from Spokane, Portland & Seattle Railway Co.; Glacier Park Hotel Co.; South Butte Mining Co.; and Washington dh Great Northern Townsite Co. — This issue involves for 1917 the question of whether or not the petitioner shall be taxed on interest accruing to it upon debts owed to it by the Spokane, Portland and Seattle Railway Co., the Glacier Park Hotel Company, the South Butte Mining Co., and the Washington and Great Northern Town-site Co. in the respective amounts of $1,572,100.07, $29,558.61, $3,518.97, and $104,085.58, and for the years 1918 and 1919 the question of whether it shall take up as income in its income-tax returns interest accruing to it on debts of the Spokane, Portland & Seattle Railway Co. in the respective amounts of $1,519,784.68 and $1,518,-227.11. All of these debtor corporations were nonaffiliated subsidiaries of the petitioner for the years involved.
The petitioner did not include in its accrued income the interest in question because it was not shown upon its books of account as accrued income. The petitioner’s books of account are kept in accordance with the requirements of the Interstate Commerce Commission. The “classification of income, profit and loss, and general balance sheet accounts of steam railroads” prescribed by that Commission in accordance with section 20 of the Act to Regulate Commerce, effective July 1, 1914, and in effect during the years 1917, 1918, and 1919, contains the following provision:
Income from funded, securities.— * * * Interest accrued shall not be credited prior to actual collection unless its payment is reasonably assured by past experience, guaranty, anticipated provision or otherwise.
The petitioner did not, however, wish to lose sight in its bookkeeping records of the fact of the accrual of the interest upon the obligations of the above named companies and therefore recorded in a balance sheet account, designated “ Other Deferred Assets,” the interest which accrued yearly upon these obligations and counterbalanced such entry by a corresponding entry on the liability side of its balance sheet designated “ Other Deferred Liabilities.” During the tax years involved the petitioner did not record the interest in its income accounts because it was of the opinion that there was no likelihood of its ever collecting the interest. George R. Martin, the petitioner’s vice president, and in 1917 its comptroller, testified that during the years 1917, 1918, and 1919 he was familiar with the financial condition of the Spokane, Portland & Seattle Railway Co.; that he received from that company weekly and monthly income accounts and *266 balance sheets, and went to Portland once or twice to examine their books for the purpose of keeping in touch with their financial requirements. He knew how far behind the Spokane, Portland & Seattle Railway Co. was in its payments. The books of the other debtor companies were kept by the petitioner’s comptroller who was also comptroller for these companies. He knew better than anybody else their actual financial condition and possibilities of future collection of the interest accruing. In connection with the interest due from the South Butte Mining Co. the comptroller stated in answer to the question as to why such interest was not accrued as income, “ Because there seemed no possibility of collecting it. The company had no income and no operations.” It was also testified by officers of the petitioner that there seemed no likelihood that the Spokane, Portland & Seattle Railway Co. would ever pay interest upon its bonds. It was continually operating at a deficit. In the opinion of one of the witnesses the coupons which matured during the taxable years were worth nothing at all. The same condition obtained with respect to the other subsidiaries. The officers of the petitioner in good faith believed that the interest never could be collected. No part of, the interest which accrued during the taxable years on any of the companies has ever been paid except a portion of that which accrued on the bonds and other interest-bearing obligations of the Spokane, Portland & Seattle Railway Co. In 1921 this company received a large payment from the United States and a part thereof was used to liquidate certain notes which that company had given to the petitioner in payment of interest which accrued prior to 1917. Based upon conditions existing in 1921, the petitioner accrued upon its books as income interest which had theretofore accrued upon the obligations of the Spokane, Portland & Seattle Railway Co. This treatment was, however, vetoed by the Interstate Commerce Commission and the entry was reversed in 1923 with the result that the interest which accrues upon the obligations of the Spokane, Portland & Seattle Railway Co. is recorded in the income accounts of the petitioner only when collections are actually made.
In justification of his action in holding that the interest which accrued upon the obligations of these subsidiaries was income of the petitioner for the years 1917, 1918, and 1919, as above indicated, the respondent points out that the balance sheets of the debtor corporations for the years involved show assets in excess of liabilities exclusive of capital liabilities; that therefore they have a net worth from which it might have been possible for the petitioner to recover the interest which accrued upon the obligations even though such recoveries would have been at the expense of the petitioner’s investment in the capital stock of the corporations. He also argues that *267 the petitioner keeps its books of account upon the accrual basis; that the requirement of the Interstate Commerce Commission is for the purpose of its proper administration of the affairs of railroads and in effect combines the cash system of accounting with the accrual system; that such practice is not permissible for the purposes of determining income for taxation, and in support of this proposition relies upon Consolidated Asphalt Co., 1 B. T. A. 79.; Clarence Schock, 1 B. T. A. 528; Henry Reubel, Executor, 1 B. T. A. 676. It is the theory of the respondent that the petitioner is required under the income-tax law to report as income the amount of interest which accrued upon interest-bearing obligations held by it for the years 1917, 1918, and 1919, regardless of the requirements of the Interstate Commerce Commission, and that if it ascertained in those years that the interest was not collectible and charged it off from its gross income, the same can be claimed as a deduction from gross income in income-tax returns.
We are satisfied from a careful study of the balance sheets and income accounts of the debtor corporations involved in this issue that the interest owed to the petitioner by these corporations could not have been collected by legal process during the taxable years if at all, without impairment of the principal investment of the petitioner in such companies. The petitioner, with the Northern Pacific Railway Co., owned the capital stock of the Spokane, Portland & Seattle Railway Co. The petitioner and its associated company might conceivably have had a receiver appointed for the Spokane, Portland & Seattle Railway Co. and might possibly have collected principal and interest upon the bonds held by it. But this would have been at the sacrifice of petitioner’s and its associate’s investment in the stock of these companies. There clearly would have been no income to the petitioner corporation from such proceeding.
Section 18 (d) of the Revenue Act of 1916 provides:
A corporation * * * keeping accounts upon any basis other than that of actual receipts and disbursements, unless such other basis does not clearly reflect its income, may, subject to regulations made by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, make its return upon the basis upon which its accounts are kept, in which case the tax shall be computed upon its income as so returned.
Section 212(b) of the Revenue Act of 1918 provides:
The net income shall be computed * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; * * * or if the method employed does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income. * * *
The petitioner kept its accounts upon the basis of the system of accounts prescribed by the Interstate Commerce Commission. It *268 could not have done otherwise. The question before us is whether the accounts of the petitioner so kept reflect the true income of the petitioner.
We have carefully considered the decisions of the Board above referred to which the respondent relies upon as requiring the petitioner, keeping its books as it does upon an accrual basis under the regulations of the Interstate Commerce Commission, to include in income the interest upon all obligations of the debtor corporations here involved. In Consolidated Asphalt Co., supra, we said:
It would be an obvious distortion to return only the gross income actually received and deduct therefrom both the amounts paid out and the payments anticipated.
In Henry Reubel, Executor, supra, it was said:
In this appeal the taxpayer followed one of the two alternative bases pro vided by statute for keeping accounts and making- returns of income. He claimed a deduction which can only be justified under the other alternative basis. In our opinion, to allow such a deduction would result in a distortion of the result of the income of the taxpayer for the year in question and would lead to the inevitable conclusion that Congress, instead of providing for two alternative bases for reporting income, each complete in itself, provided for alternative bases with respect to the reporting of items of income and the taking of items of deductions. Such a holding would be inconsistent with the specific language of Congress in sections 200 and 212 and wholly at variance with the obvious intent of Congress that income should be reported in such a manner upon an annual accounting basis as to reflect the truth.
The statute does not lay down two alternative bases for keeping accounts and making returns of income. It simply provides that a corporation keeping accounts upon any basis other than that of actual receipts and disbursements may, subject to regulations, make its returns upon the basis upon which its books are kept “unless such other basis does not clearly reflect its income.” We are not therefore primarily concerned with whether the classification of accounts of steam railroads laid down by the Interstate Commerce Commission is an accrual system of accounting or some other system. The only question before us is whether the system reflects the income of the petitioner.
As indicated by the income-taxing statutes, corporations keeping books of account may make their returns upon the basis of actual receipts and disbursements or upon some other basis which truly reflects income. There are two methods of accounting in general use, (1) the cash basis commonly used by individuals and small concerns, and (2) the so-called “ accrual basis.” Both methods have for their object the same purpose, which is the recording of the financial transactions of a business and the summarizing of the results so as to show the effect of these transactions upon the business. *269 The principal difference between them is the period of time to which a given transaction is allocated.
Under either method the taxpayer must have before him some definitely ascertained item of income to record before it can be reported and if a given transaction does not correspond to the definition of income then there is no income to record whether the taxpayer keeps its books on a cash or an accrual basis. Where books are kept on the accrual basis there is no requirement that there shall be accrued as income that which may never be received. The position of the respondent in this case carried to its logical conclusion would require a taxpayer keeping its books of account upon the accrual basis to accrue as income interest on bonds held as an investment which it did not collect and which in all probability it never would collect. If the theory of the respondent is correct an insolvent corporation keeping its books of account upon the accrual basis might merely by the purchase of bonds of insolvent corporations upon which interest was neither being earned or paid, easily show a large income.
In our opinion the requirement of the Interstate Commerce Commission that interest accrued on funded securities shall not be credited to income accounts prior to actual collection “unless its payment is reasonably assured by past experience, guaranty, anticipated provision or otherwise,” is entirely consistent with a system of accounting which is designed to reflect any company’s true income. If the petitioner had kept its accounts in the manner suggested by the respondent it would have reported to the public each year that it had earned income in excess of one million and a half dollars which, as a matter of fact, it had not received and which in all probability it would never receive. Such a system of accounting would not have reflected the petitioner’s true income but would have given to its stockholders and the public a false idea of its income.
The respondent does not contend that the petitioner actually had earnings during the taxable years of the interest that accrued upon the interest-bearing obligations of its subsidiaries herein considered. It does contend, however, that it should have accrued the interest upon its books of account and unless it can show that the interest could not be collected by legal process and that the amounts accrued upon its books had been charged off as bad debts, the petitioner is liable to income tax in respect of such interest. Manifestly, the petitioner can not keep its books of account in the manner suggested by the respondent. It is prohibited by the rulings of the Interstate Commerce Commission to set up as income the accrued interest. Therefore it could not have charged the amounts off.
*270 We are of the opinion that the interest npon the interest-bearing obligations of the debtor corporations above enumerated which was not collected during the tax years involved was not taxable income.
4. Depreciation on equipment of petitioner scrapped or sold; hoots of Glacier Park, Hotel Co. destroyed; property of Cottonwood Coal Co. destroyed; and facilities of Somers Lumber Co. destroyed or sold. — Various items involved in this issue do not present for the determination of the Board any question of fact since all of the facts involved are agreed upon by the parties. The only question presented is whether in determining the deduction on account of loss sustained by destruction, sale or scrapping of assets, the March 1, 1913, value or cost subsequent to that date should be reduced by depreciation sustained up to the date of destruction, sale, or scrapping, which depreciation was charged off the petitioner’s books of account and presumably claimed as a deduction from gross income in income-tax returns.
The principle involved in this question has heretofore been decided by the Board adversely to the contentions of the petitioner in Even Realty Co., 1 B. T. A. 355. The principle has also been decided adversely to the petitioner in the recent decision of the United States Supreme Court in United States v. Ludey, 274 U. S. 295.
5. Loss on stock of Spokane & Inland Empire Railroad Co.— This issue is merely one of fact, namely, the value at March 1, 1913, of stock, both preferred and common, of the Spokane & Inland Empire Railroad Co. which became worthless in the hands of the petitioner in 1918. The petitioner wrote off as a loss for that year the entire cost of the stock of the above-named company which it had acquired from 1906 to 1909. The respondent conceded that the stock was worthless in 1918 but did not allow the loss claimed. He allowed a loss based on a March 1,1913, value of $10 per share for the common stock and $30 per share for the preferred stock. These amounts were the prices which were bid for the stocks as shown by market quotations on or about March 1,1913. The asked prices, as shown by such quotations, were $20 for the common stock and $40 for the preferred. There were no sales of either class so far as the record shows at or about the basic date. The Spokane & Inland Empire Railroad Co. occupied a unique position with respect to the railroad operations of the petitioner. It was an electric road 212 miles long. It extended into the Coeur d’ Aleñe territory of Idaho, and to certain points in the State of Washington. The road tapped rich wheat and lumbering sections. At the time the stock was acquired it was believed that the road would act as a valuable feeder to the petitioner and to the Northern Pacific Railway Co., which also purchased heavily of the stock. The passenger traffic on the road was heavy for a number of years. The control of the road to a large extent meant the control of traffic *271 originating in the territory. The petitioner, together with the Northern Pacific Eailroad Co., had a controlling interest in the voting stock of the company. We have no doubt that this factor should be taken into account in determining the fair market value as of March 1,1913. Phillips v. United States, 12 Fed. (2d) 598.
The petitioner contends that the fair market price or value of its shares of common stock in the Spokane & Inland Empire Eailroad Co. on March 1, 1913, was $30 per share for the common stock and $90 per share for the preferred stock. In support of its contention it placed on the stand at the hearing an investment banker who testified that in his opinion the fair market value of the common stock on March 1, 1913, was $30 per share and of the preferred stock $60 per share. Taking into consideration all of the evidence of record we are of the opinion that these values represent the fair market values on March 1, 1913, of the stock held by the petitioner. We therefore determine the fair market value of the petitioner’s shares on the basic date and the loss sustained in 1918 to be $1,689,585.
6. Pro-fit or loss on sales of various parcels of land. — The sole question involved in this issue is one of fact, namely, the cost and March 1, 1913, value of five parcels of property sold during the year 1918. The respondent has determined an aggregate profit of $2,745.94 from the sale of these parcels, based upon the March 1,1913, value, whereas the petitioner contends that no taxable profit was realized on the sale of any parcel and that a deductible loss of $1,325.80 was sustained on the sale of 39.14 acres near Helena, Mont. The evidence satisfies us that no taxable profit was sustained upon the sale of any parcel and that an actual loss, as contended for by the petitioner, was sustained upon the sale of the tract of land near Helena. The petitioner is, therefore, entitled to the deduction of a loss of $1,325.80 on these sales.
7. Contributions towards the construction of spur tracks, etc.— The question involved in this issue grows out of the acquisition by the petitioner, without cost to it, of facilities such as spur tracks and farm crossings on its right of way constructed at the cost of patrons of the railroad.
It was the practice of this carrier, where an industry located along its tracks desired transportation facilities from its plant, to construct the necessary spur track, take title to so much thereof as lay on its right of way, and require the industry to pay the cost of construction. This item is accounted for under the Interstate Commerce Commission’s rule entitled “Account No. 606. Donations.” Where the facility was constructed by the industry the cost of construction to the industry was taken upon the petitioner’s books either at the exact cost to the industry, or at the estimated cost thereof. The *272 amount of the contributions, including the estimated value of the labor and material furnished by the industry or persons performing the labor, was $28,116.04 in 1918, and $19,128.98 in 1919. The petitioner did not return these amounts as income in its income-tax returns upon the theory that they did not constitute taxable income within the meaning of the Sixteenth Amendment and the income-tax laws. The respondent has amended the petitioner’s returns for these years by including in the gross income the above amounts.
It is the contention of the respondent that all of the tests of income are met in the receipt of these amounts. He argues that the carrier is to furnish service at a point away from the main line and that the industry is to pay the cost of the property to which the carrier gets title; that the consideration given by the road is its service at the point of the spur track; that this is obviously a charge imposed upon the industry over and above tariff rates; that the petitioner’s assets are increased by the cost or value of the facility and on such investment the petitioner is entitled to earn a fair return; furthermore, that rights are reserved in the contract to move freight of other industries over such spurs from points beyond the first industry’s property into the lines of the carrier.
On behalf of the petitioner, it is argued that the amounts received were not derived from the employment of labor, from capital, or from both combined, and that they do not constitute income as that word has been defined in numerous decisions of the Supreme Court. Eisner v. Macomber, 252 U. S. 189; Merehants’ Loan & Trust Co. v. Smietanka, 255 U. S. 509; United States v. Phellis, 257 U. S. 156; Edwards v. Cuba Railroad Co., 268 U. S. 628; Bowers v. Kerbaugh-Empire Co., 271 U. S. 170. The facts in this case are strikingly similar to those which obtained in'the Appeal of Liberty Light & Power Co., 4 B. T. A. 155. In that case, the petitioner had entered into four contracts with certain individuals for the construction of transmission lines in territory in which the power company had assumed no franchise obligations. The contracts provided that the title to the lines should be in the power company, but that the individuals should contribute a certain part of the cost of construction. The accounting rules prescribed by the Indiana Public Utilities Commission provided that in such cases the entire cost of construction should be charged to the proper capital account and the amount contributed by the individuals should be credited to an account styled “ Donations in Aid of Construction.” Belying upon the Cuba Railroad Co. decision above cited, we held that such contributions did not constitute taxable income to the power company. There is nothing to distinguish that case from the one under consideration. We there extensively reviewed the authorities upon this subject. In accord- *273 anee with the rule laid down in that case, we are of the opinion that the petitioner is not liable to income tax in respect of the contributions received in aid of construction during the years 1918 and 1919.
8. Compensation due petitioner under the Federal Control Act.— The standard return, or annual compensation based upon the annual average earnings for the “ test period,” agreed to in the contract of this petitioner and its subsidiaries with the Director General, was $28,774,899.45. By the terms of the contract this was not a final figure, but was subject to correction by increase or decrease as the Commission might determine under the provisions of the preamble of the agreement. This provides for a correction of the tentative standard return to accord with what the Commission might certify after the accounts and reports of the company, used by the Commission in arriving at the standard return, may have been brought into conformity with the accounting rules of the Commission. When the Commission finally certified the standard return it was changed to $28,684,405.60, or $90,493.85 less than that contained in the contract and reported in the returns of the petitioner.
This issue is fully controlled by the principle adopted by the Board in its decision in Appeal of Illinois Terminal Co., 5 B. T. A. 15. All of the facts necessary to a determination of the correct standard return were in existence and capable of ascertainment within the year 1918 and before the year 1919. Under such circumstances the corrected figure is the proper amount to be accrued. United States v. Anderson, 269 U. S. 422.
9. Interest due from Director General under Federal control agreement. — Section 4(a) of the contract of the petitioner with the Director General provided that balances of certain accounts therein and previously mentioned in the contract should be struck quarterly and that such balances should bear interest at a specified rate. The balances in question were not in fact struck. The petitioner accrued nothing on its books in the year 1918 on account of interest on such balances. It, however, accrued in 1919 interest due it by the Director General in the amount of $1,570,199.75. The respondent determined that the interest on such quarterly balances accruable in the year 1918 was $693,005.39 and in the year 1919 was $351,764.86. The petitioner desires to return its income from this source in accordance with its books and to adjust any differences in the year in which it made final settlement with the Director General.
An examination of the contract indicates that all of the facts necessary for a determination of the quarterly balances were in existence and known or capable of being known at the end of each quarter. There is no evidence to indicate that these balances depended upon any contingencies or any basic facts to come into existence in later years. We are of the opinion that this issue is con *274 trolled the same as the preceding one by the decision of the Board in Illinois Terminal Co., supra. The action of the respondent upon this point is sustained.
10. Interest due from the Farmers Grain & Shipping Co. — The petitioner claims affiliation with the Farmers Grain & Shipping Co. If this contention is granted, the action of the respondent by adding to the petitioner’s gross income for 1918 and 1919 any amount for interest due it from its subsidiary must be reversed.
The petitioner owned 100 per cent of the capital stock of the Brandon, Devils Lake & Southern Bailway, which in turn owned 60.51 per cent of the stock of the Farmers Grain & Shipping Co. The properties of the Brandon and Farmers companies were operated as a unit and as a part of the system of the petitioner.
There is no evidence that the minority of 39.49 per cent of the Farmers Grain & Shipping Co. stock was either owned or controlled by the petitioner, its subsidiaries, its stockholders, or its subsidiary’s stockholders. The evidence does not warrant a conclusion that substantially all of the stock of this company was owned directly or controlled through closely affiliated interests, or by a nominee or nominees of the petitioner. We must, therefore, hold that the petitioner was not affiliated with the Farmers Grain & Shipping Co. during either of the years 1918 or 1919. See Adaskin-Tilley Furniture Co. v. Commissioner, 6 B. T. A. 316.
This makes it necessary to determine whether the petitioner derived any income from the accrual of interest upon the obligations of the Farmers Grain & Shipping Co. The situation here is substantially the same as that considered in the third issue of this proceeding. Under the regulations of the Interstate Commerce Commission the petitioner could not take into income the interest which accrued upon these obligations for the reason that the interest was not paid during the taxable years and the payment was not “ reasonably assured by past experience, guaranty, anticipated provision or otherwise.” The company was not earning any interest upon its obligations and had not been for many years. The petitioner derived no income from the interest accruable upon bonds of this company during the taxable years and the addition to the reported income of the petitioner of any amount for interest upon these obligations was in error.
11. Alleged sale of steamship by Northern Steamship Co. — The contention of the petitioner upon this issue is that there was no sale of the steamship Northland by the Northern Steamship Co., an affiliated subsidiary of the petitioner, in 1918; that if it be held, however, that there was a sale in the year 1918 the gain therefrom should be computed upon the installment-sale method and that the only income from the transaction was the $200,000 received from Barnard in 1919. The contention of the respondent upon this point is that one of the *275 subsidiaries of the petitioner entered into a contract in 1918 for the sale of the steamship Northland at a price of $600,000; that if the-purchase price had been paid in cash at the date of sale the profit which would have been realized would have amounted to $65,207.13; that the contract of sale was valid; that payments were not to be made in installments and that the profit which actually accrued to it in 1918 was $65,207.13.
The Northern Steamship Co. received no down payments on account of the sale of the steamer Northland in 1918. It admits that it received $200,000 in 1919 and confesses that it is liable to income tax in respect of the amount received in 1919. In our opinion this is the only amount of income received by the petitioner from this transaction, and we think, in the circumstances, it was properly allocated by the petitioner to the year 1919.
12. Taxes due from Director General. — The issue here raised is whether the petitioner is liable to tax upon its net income at the rates of 12 per cent and 10 per cent for the years 1918 and 1919, respectively, or at the rates of 10 per cent and 8 per cent for those years, respectively. This issue is controlled by the decision of the Board in New York, Ontario & Western Railway Co., 1 B. T. A. 1172. In accordance therewith, it is held that the proper rates applicable are 10 per cent for 1918 and 8 per cent for 1919.
13. Depreciation on Ore Dochs.- — -The petitioner submits that if the Board holds that its accounts relating to Federal control operations in 1918 and 1919 should be restated to correspond with the books of the Director General, then its income for the years 1918 and 1919, respectively, should be reduced in the sum of $188,686.41, representing depreciation actually sustained and charged to the Director General, but which the Director General’s books show was not assumed or paid by him.
That the depreciation claimed to have been sustained by the petitioner upon its dock property at Allouez Bay, Wis., was actually sustained as claimed is admitted by the respondent’s answer. In accordance therewith, the claim of the petitioner with respect to additional depreciation for the years 1918 and 1919 is allowed.
14. Assessment paid to Association of Railway Executiwes. — There was in existence during the year 1919 an association known as the “Association of Railway Executives.” On October 16, 1919, the president of that association mailed the president of the petitioner a letter announcing plans for the assessment of $1,600,000 for the support of the association. Included in the letter was a committee report relating to the proposed expenditure by the association of $1,000,000 for the purpose of a publicity campaign to bring pressure to bear upon Congress through the medium of public opinion to enact *276 legislation favorable to the railroads in connection with the return of the roads to private control and in connection with other legislation affecting the roads.
On November 1, 1919, the president of the association mailed a letter to the petitioner containing a statement that its quota of the entire assessment of $1,600,000 was $57,553.83, of which one-half, or $28,776.91, was due and payable immediately, and that the remaining one-half would be due and payable in two installments during the year 1920. The respondent contends that ten-sixteenths of the amount paid in 1919 should be disallowed as a deduction from gross income on the ground that to this extent the payment to the association was not an ordinary and necessary business expense.
The evidence before the Board does not show how or for what purpose the money collected by the Association of Railway Executives was expended nor to what account or accounts the payment made by the petitioner in 1919 was charged on its books. The record is also silent as to whether the petitioner deducted this payment from its gross income in making its income-tax return for 1919. This issue injected into the proceeding by the respondent is, for lack of proof on his part, decided in favor of the petitioner.
Reviewed by the Board.
Judgment mil be entered on 15 days' notice, under Rule 50.
SterNI-iageN dissents in part.