AMERICAN CIGAR CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 16229. Promulgated November 29, 1930.

*Thomas G. Haight, Esq., Robert H. Montgomery, Esq., J. Marvin Haynes, Esq., James O. Wynn, Esq.,* and *William Diebold, Esq.,* for the petitioner.

*John D. Foley, Esq.,* and *Lloyd W. Creason, Esq.,* for the respondent.

468 .

472

478

484

488

OPINION.

Murdock: 1. Early in the year 1902 the petitioner purchased all of the stock of the Cabanas Co. for $1,500,000. It exchanged this stock about five months later for $1,800 in cash, $3,500,000 par value of the bonds, and $19,998,200 par value of the common stock of the Havana Tobacco Co. It computes a profit on this latter transaction as follows:

Received—

| | |
|---|---:|
| $3,500,000 par value of bonds worth 90 | $3,150,000 |
| $19,998,200 par value of stock worth 50 | 9,999,100 |
| Cash | 1,800 |
| Total | 13,150,900 |

Gave for the above—

| | |
|---|---:|
| Cabanas stock purchased at par | 1,500,000 |
| Profit | 11,650,900 |

It claims that this profit, reduced by subsequent sales of the stock to $11,015,992.60, was a part of its earned surplus during the years 1918 to 1920, inclusive.

The respondent contends that the petitioner realized no profit from this transaction because the stock and bonds received were worth no more than $1,500,000, the cost of the Cabanas stock. He computed invested capital without including any part of this alleged profit in the petitioner's earned surplus. However, there is evidence before us that the fair market value of the securities received by the petitioner exceeded $1,500,000 and this evidence overcomes the presumption of correctness which attaches to the Commissioner's determination. Cf. *Christensen Machine Co.*, 18 B. T. A. 256; *Citrus Soap Co. of California* v. *Lucas*, 42 Fed. (2d) 372. Thus, the fact that the petitioner realized a profit has been established, and our question is to determine the amount of such profit which remained as earned surplus during the years 1918 to 1920, inclusive.

The petitioner points to the fine prospects of the new company, to the array of successful men back of it, and to the sales of the Havana Tobacco Co. common stock at $50, and up, about the time of the exchange to prove that its fair market value was at least $50 a share. It also argues that this value is shown by the fact that Havana Commercial common, 2½ shares of which were exchangeable under the plan of consolidation for one share of Havana Tobacco Co. common, was selling at $20 on the day of the exchange. Similarly, 100 shares of Havana Commercial preferred, for which $61 was bid and $63 asked, were exchangeable for 60 shares of preferred and 40 shares of common of Havana Tobacco Co. stock, therefore, Havana Tobacco Co. common was worth $50, allowing $70 as the value of its preferred.

There were no sales of the bonds of the Havana Tobacco Co. at or about the time of the exchange. No "bid and asked" prices for these bonds are available. The petitioner called an expert witness to prove that their fair market value was about 90. This was a proper method of proof, as we had no special knowledge of the probable value of these bonds. *Heiner* v. *Crosby*, 24 Fed. (2d) 191; *Boggs & Buhl, Inc.* v. *Commissioner*, 34 Fed. (2d) 859. This man

told why he thought these bonds would have sold readily at 90. He was well qualified to express an opinion, his reasoning is persuasive, his testimony was not weakened upon cross-examination, and not only was there no proof of a contradictory nature, but his opinion is supported by other evidence that the bonds were valuable. Therefore his opinion is entitled to weight. *Boggs & Buhl, Inc.* v. *Commissioner, supra.*

There were no sales of large blocks of Havana Tobacco Co. common at or reasonably near the date of the exchange, but such sales as there were indicate that the value of this stock was between $41 and $60 a share. There were no peculiar circumstances connected with these sales so far as we know.

We have tried to determine the petitioner's earned surplus as accurately as possible from a careful study of all of the evidence presented. Where necessary, we have borne down heavily upon the petitioner whose duty it was to prove a larger profit, if larger profit there was. *George M. Cohan* v. *Commissioner*, 39 Fed. (2d) 540. Our conclusion is that, of the original profit, $9,907,092.60 remained as earned surplus in the years 1918 to 1920, inclusive. Cf. *Conley Tin Foil Corporation*, 17 B. T. A. 65; *Ralph Andrew Applegate, Executor*, 10 B. T. A. 705; *Walter A. Edwards*, 10 B. T. A. 39; *Marshall Field, Glore, Ward & Co.*, 16 B. T. A. 1299; *Wilber National Bank of Oneonta, N. Y., Executor*, 17 B. T. A. 654; *Simplex Engineering Co.*, 17 B. T. A. 504. This amount should be included in the petitioner's earned surplus in computing its invested capital for these years.

2. The petitioner alleges that the respondent erred in including in its gross income the amount of bond interest owed it by the Havana Tobacco Co., which company was insolvent and unable to pay this interest. As an alternative, it alleges that the Commissioner erred in not allowing the amounts of these interest payments due in each of the years to be deducted in the respective years as debts ascertained to be worthless and charged off. These allegations, in view of the facts, require a somewhat complicated discussion.

We do not know of any decided case which is directly in point. The case has some points in common with the case of *Great Northern Railway Co.*, 8 B. T. A. 225, but in several important details the two cases are different. One difference, although not the only one, is that in the present case the petitioner actually received the interest. It is true that it loaned the money to the Havana Co. with which the latter paid the interest. But the petitioner, by this method of its own choosing, materially changed its relations with the Havana Co. It surrendered the coupons on the bonds and received the interest therefor, and at the same time it became a creditor of the Havana Co. in

the amount of its advances, which advances were secured by interest bearing notes. As has frequently been said, tax liability must be determined by what was done as opposed to what might have been done, and it makes no difference that the petitioner might have advanced only the money to pay the interest on bonds held by others and left its coupons uncut. Cf. *Nixon* v. *Lucas*, 42 Fed. (2d) 833. If it had done that, this case would be one step nearer the *Great Northern Railway Co.* case, *supra*.

The petitioner kept its books and reported its income on an accrual basis. Apparently, it accrued the interest on these bonds on its books, but it did so in a special way by means of an " interest suspense account." The financial situation of the Havana Tobacco Co. was very bad. Nevertheless, the petitioner received its interest. Furthermore, it had a valid claim to the amount of the interest and the interest was a proper accrual as it became due. The president of the Havana Tobacco Co. testified that the men back of the American Tobacco Co. were very proud of the fact that they had never brought out a failure; they were loath to allow the Havana Tobacco Co. to get into the hands of a receiver; and they wanted him to make every possible effort to bring the company out of its difficulties. He further testified that he did not have any hope of being successful, but he thought if he could keep it going as a live proposition, then, if it ever had to be reorganized, " it was going to be far better as a capital investment than throwing it overboard, which subsequently turned out to be the case." In view of this testimony and other circumstances of the case, including the fact that, when the Havana Tobacco Co. was finally reorganized, the petitioner received securities on the basis of all of the unpaid principal and interest which the Havana Co. owed it, we can not say that the Commissioner erred in including the amount of interest due in the petitioner's gross income for the various years, except as explained hereafter. We need not decide whether the petitioner would have been in a better position had it claimed that the amount of its advances to the Havana Tobacco Co. had become worthless and should be deducted as bad debts, for it did not so allege, and the proof here does not cover such a point.

The petitioner is in no better position as to its alternative allegation that the amounts which it received as interest should be deducted as debts ascertained to be worthless and charged off. As we have said, the amounts were actually paid and they no longer represented a debt. Having been paid, they could not be ascertained to be worthless. Therefore, it is not necessary to consider whether the circumstances of the " interest suspense account " constitute a sufficient charge off.

The Commissioner has also included in the petitioner's income for 1921 the interest, amounting to $118,450, due on the bonds on or

about December 1, 1921. The Havana Tobacco Co. defaulted as to this interest and the petitioner never received it. In view of the financial condition of the Havana Tobacco Co. at the time this interest became due, which condition was known to the petitioner and remained unchanged at the end of the year, the amount of this interest should not have been included in the petitioner's income for that year. The Commissioner required the petitioner to report the interest on its advances evidenced by notes, but allowed a bad debt deduction to exactly offset the amount of this interest which was never received. In explanation he stated in his deficiency notice:

This office holds that as there appears to be no reasonable expectation of the American Cigar Company receiving the interest on the notes of the Havana Tobacco Company, due to the latter company's financial condition, the interest on the advances should be allowed as a bad debt in the same year in which reported as income. The amount allowed as a bad debt has been added to your taxable income under Item (a) above.

Where, as here, at the time the interest became due there was no reasonable expectation of receiving it, to exclude the amount from income seems more proper than to include it and then allow it as a bad debt. *Great Northern Railway Co., supra; Sowers Manufacturing Co.,* 16 B. T. A. 268; *Thorne, Neal & Co.,* 13 B. T. A. 490; *Northwestern Improvement Co.,* 14 B. T. A. 79; *Turner Falls Power & Electric Co.,* 15 B. T. A. 983; *La Salle Cement Co.,* 15 B. T. A. 1127; *Wankinco Bog Co.,* 16 B. T. A. 386; *Corn Exchange Bank* v. *United States,* 37 Fed. (2d) 34. However, the net result is the same in either case. The respondent, by amendment to his answer, alleged that he erred in allowing the interest on the notes of the Havana Tobacco Co. to be deducted. For the same reasons that we have given above relating to the interest on the bonds due December 1, 1921, we think that the deficiency should not be increased as now claimed by the respondent.

As another alternative, the petitioner contends that if the interest was income to it, the amount of the accrued interest receivable on the bonds as of December 31, 1917, should be included in its surplus during the years 1918 to 1920, inclusive, for invested capital purposes. This contention is well taken. Cf. *Schmoller & Mueller Piano Co.,* 1 B. T. A. 498; *National Grocer Co.,* 1 B. T. A. 688; *Pacific Coast Redwood Co.,* 5 B. T. A. 423; *Gould Coupler Co.,* 5 B. T. A. 499; *Willcuts* v. *Milton Dairy Co.,* 275 U. S. 215; *La Belle Iron Works* v. *United States,* 256 U. S. 377.

3. The interest due on the advances to the Murias Co. is in the same category as that interest on the Havana Co. bonds due December 1, 1921, which was never paid. This interest was not taxable income to the petitioner, because at the time it became due there was no reasonable expectation of receiving it. The petitioner fully

realized this fact, but made the advances regardless of it, for sufficient reasons. *Great Northern Railway Co., supra; Sowers Manufacturing Co., supra; Corn Exchange Bank* v. *United States, supra*, and other cases already cited. We need not consider the petitioner's alternative contentions on this point, as our decision is for the petitioner on the main contention.

4. The petitioner contends that during 1918 it or its subsidiary owned one-half or 95 shares of the capital stock of Luis Marx Tobacco Co., which cost it $210,000, and that this amount, instead of $50,000, should be used in the computation of invested capital for each year. The respondent now claims that he erred in the use of $50,000 in this computation. In 1906 the petitioner and Marx entered into a contract under which the petitioner or its subsidiary was to buy, at market prices, the tobacco raised on Marx's land. An amount representing what would otherwise be the net profit to Marx from the sale of his tobacco was placed in a trust fund. At certain times the petitioner could buy the land from Marx at $400,000 and secure also the amount then in the trust fund. Otherwise, Marx eventually was to receive the trust fund representing his net profits. In 1909, when the contract had yet several years to run, and when the trust fund amounted to about $210,000, the old contract was canceled and a new one was entered into. As a result, a new corporation was organized and Marx transferred his land to it, received the trust fund, retained one-half of the stock of the new corporation, and secured a contract of employment. The petitioner or its subsidiary gave up its rights under the old contract and received one-half of the stock of the new corporation. Its rights under the old contract had cost it nothing, since it had merely paid the market price for its tobacco, but might have been valuable at the time they were given up. When it received the stock, the petitioner realized a profit equal to the fair market value of the stock received. This stock was an asset which could, and properly should, have been entered on the subsidiary's books at its fair market value, and an increase in surplus in this amount would have resulted. This surplus, subject to the limitations on inadmissibles, should be used in computing invested capital for 1918. The stock was entered on the books of the subsidiary at $50,000, and the respondent used this amount in computing invested capital for 1918.

The petitioner argues that in 1909, under the first contract, it could have acquired land worth $400,000 and other property for $190,000 (since it would get the trust fund upon purchasing the property for $400,000) and therefore, as it got only one-half of the stock, this stock cost it $210,000. Even if this were correct, the petitioner's claim for increased invested capital would not be

established thereby. In this connection it may not be improper to point out that the same alleged facts support the argument that, since the only assets of the new corporation were the plantations, one-half the stock would be worth no more than one-half the value of the plantations; in 1909 the petitioner could have had the plantations for $190,000 net, but it did not care to give this amount; therefore, the value of this property was not as great as $190,000, and one-half of the value of the land, which would be some indication of the value of one-half the stock, was not as great as $95,000, perhaps no more than $50,000, the amount at which the stock was entered on the books of the subsidiary.

The value of the property conveyed to the Marx Tobacco Co. is not established by the evidence. In fact, no effort was made to prove this value. But what is most important, the evidence does not establish that the fair market value of this stock in 1909 was other than $50,000. As to this issue we leave the parties as we found them.

5. The evidence in regard to the balance of $62,751.82 in the "Leaf Adjustment Account" of the Cuban Co. is not at all clear. Any deficiency or uncertainty in this evidence is to the petitioner's disadvantage, because the Commissioner's determination is presumed to be correct. He denied that the balance represented surplus, claiming that it was in effect an appreciation in inventory over cost.

Apparently, the Cuban Co. either purchased or raised some tobacco in 1916 at a certain cost. Its leaf manager put a price on it of its market value, which was higher than cost. What became of the tobacco we do not know. If the Cuban Co. kept it and at the end of the year inventoried it at more than cost, the difference between the inventory figure and cost would not represent earnings of the company. *F. N. Johnson Co.*, 2 B. T. A. 256; *David Rodefer Oil Co.*, 11 B. T. A. 782; *Wickens Co.*, 16 B. T. A. 968; *United States v. Kemp*, 12 Fed. (2d) 7; 25 Fed. (2d) 721; certiorari denied, 273 U. S. 703. See also *Lucas* v. *Kansas City Structural Steel Co.*, 281 U. S. 264. The record does not show that the tobacco was ever disposed of at the price placed upon it by the leaf manager. We think the evidence tends to confirm the Commissioner, at least it does not prove him wrong.

6. The petitioner claims the right to deduct $54,199.76 for 1920 as a reasonable amount for the obsolescence of some buildings used in its trade or business. The respondent, in his brief, claims that there has been no showing that these structures had been abandoned and no proof of their fair market value on March 1, 1913. In our opinion the petitioner is entitled to deduct the amount as a loss

rather than as a reasonable amount for obsolescence. The testimony proves conclusively that these structures lost all value when the petitioner ceased to use the land on which they were situated, and there was no way by sale, removal or otherwise that any benefit could be derived from them. There was testimony that the land would not regain its fertility for many years, if ever. In the meanwhile, the cheap structures here in question would be in ruins. This is not a case where the structures have merely lost useful value or are no longer useful to the petitioner, but is a case where they have become utterly worthless even though the petitioner continued to own the land. Cf. *Marigold Garden Co.*, 6 B. T. A. 368; *Kilby Car & Foundry Co.*, 4 B. T. A. 1294; *Multibestos Co.*, 6 B. T. A. 1060; *Winter Garden Co.*, 10 B. T. A. 71. The one-time president of the American Cigar Co., who had had many years of experience in the tobacco business in Cuba, had frequently inspected these properties, and had ordered that the cultivation of the farms be discontinued, testified that the value of the structures on March 1, 1913, was the same as the amount at which they were then carried on the books of the Cuban Co. We think they were worth at least the amount stated.

7. Invested capital is a statutory concept. Any question of invested capital must be studied with section 326 well in mind. *Willcuts* v. *Milton Dairy Co.*, supra. If a taxpayer corporation purchases its own stock originally issued for cash at par, by giving its note therefor, a reduction in its invested capital in the amount of the note results. Cf. *Fairmont & Cleveland Coal Co.*, 12 B. T. A. 1296; *Clearfield Lumber Co.*, 3 B. T. A. 1282; *National Tea Co.*, 17 B. T. A. 1222. As to such stock, there is no longer a stockholder, and consequently no one having anything risked in the business. The money formerly risked is no longer risked because the relation of the stockholder to the corporation has been terminated by the corporation returning some of its property in exchange for the stock. A note is a liability which is not reflected in invested capital. Where a corporation purchases its own stock by giving its own note therefor the note holder, the former stockholder, is in a new relation to the corporation, that of a creditor, a lender of money to the corporation. Borrowed money is not a part of invested capital. Without any change in assets, the corporation has a new liability in the amount of the note, the par value of capital stock outstanding has been reduced by the amount of the par value of the stock purchased, and any difference between the amount of the note and the par value of the stock acquired is adjusted through surplus, if surplus is sufficient for the purpose. Cf. *Hutchins Lumber & Storage Co.*, 4 B. T. A. 705. The same reduction in invested capital would result

if the corporation gave its note without at the same time acquiring its stock or some asset, because in that case surplus would be reduced by the entire amount of the note.

In the present case when the petitioner assumed the liabilities of Seidenberg & Co., it assumed the liability on notes in the amount of $240,000. On January 1, 1918, these notes in this amount were a liability of the petitioner which, in accordance with its method of accounting, it would have to set up on its books as liabilities. Unless it at that time had an asset which would offset this total liability, its invested capital would be reduced as above demonstrated. The case of *Cleveland Railway Co.* v. *Commissioner*, 36 Fed. (2d) 347, is distinguishable. The question then is, Did it have any offsetting asset? If it owned the stock outright, such stock would not be an asset. If it did not own the stock, such stock would not be an asset. If there was anything else which would represent an offsetting asset, it has not been called to our attention and its cost or value as an asset has not been demonstrated or established. Thus, we need not trouble ourselves about the question of ownership of the stock, for the petitioner must fail in its contention in any event.

We have found as a fact that on or about the first day of March in each of the years 1918, 1919, and 1920 the petitioner delivered 600 shares of its stock to Glenn and Schneider, and that on account thereof, the Commissioner included in the petitioner's invested capital, for the years 1918 and 1919, $45,369.86 and $43,857.53. We do not know what amount, if any, he included for the year 1920. The petitioner contends as an alternative, that for each of these three years about $50,000 should have been included in its invested capital on account of the delivery of these shares of stock, the exact amount to be determined by taking that proportion of $60,000 which the number of days in the year after the day on which the stock was delivered bears to the total number of days in the year. In order to sustain this contention, in view of our holding that the amount originally paid in for this stock is no longer a part of invested capital, it was encumbent upon the petitioner to prove facts which would bring the case within some certain provision of section 326, and enable a proper computation of invested capital to be made under that provision. These facts have not been established and we will not disturb the Commissioner's determination on this point.

8. The petitioner contends that it sustained a deductible loss of $20,513.74 when, at the end of the year 1918, upon the transfer to it of all of the stock of the Beech Cigar Co. of the then fair market value of not more than $79,486.26, it canceled certain promissory notes, on which it had advanced $100,000. It also makes an alterna-

tive contention, that if the amount was not a loss, it was a debt ascertained to be worthless and charged off within the year. In the decision of this case it is not necessary to determine whether or not a debt resulted from this transaction. If it was a debt, the principle laid down in *Steele Cotton Mill Co.*, 1 B. T. A. 299, does not apply because here we do not have a situation where a part of a debt was written off as worthless and the other part maintained on the books of the taxpayer as having a value. On the contrary, all the means of collecting the debt of $100,000 were exhausted, the debt was canceled, the petitioner was in the possession of stock worth not more than $79,486.26, and it charged off the balance of the $100,000. This entitles it to a deduction under section 234(a)(5). On the other hand, if the debt provisions of the statute are not applicable, then under the loss provision, since the transaction was closed in the year 1918, the petitioner lost the difference between the amount of the money advanced and the value of the stock which it secured. Cf. *Farmers' & Merchants' Bank of Nocona, Tex.*, 10 B. T. A. 709; *Turner Falls Power & Electric Co.*, 15 B. T. A. 983.

9. In 1919 the petitioner received dividends amounting to $12,622.43 from the Bock Co., a foreign corporation. It claims a deduction of this amount from its gross income under section 234(a)(6) of the Revenue Act of 1918, which permits the deduction of " amounts received as dividends from a corporation which is taxable under this title upon its net income."

" Net income " is defined in section 232 of the 1918 Act as " the gross income as defined in section 233 less the deductions allowed by section 234." Section 233 (b) provides that:

In the case of a foreign corporation gross income includes only the gross income from sources within the United States, including the interest on bonds, notes, or other interest bearing obligations of residents, corporate or otherwise, dividends from resident corporations, and including all amounts received (although paid under a contract for the sale of goods or otherwise) representing profit on the manufacture and disposition of goods within the United States.

The respondent's answer admits that the Bock Co. realized income from sources within the United States, that certain deductions were allowed, and that a tax was paid on the excess of its income over the deductions allowed. By applying the provisions of sections 233, 234, and 232 of the 1918 Act to the Bock Co., we find that the Bock Co. was taxed upon its " net income."

The Commissioner, in explaining his action, mentioned section 234(a)(6) of the Revenue Act of 1921 as authority for what he had done. This section is quite different from the same section of the Revenue Act of 1918 which applies here. The amount of the dividends in question should be deducted from the petitioner's gross

income for the year 1918. To the same effect see T. B. M. 21, C. B. No. 1, p. 160, and O. D. 383, C. B. No. 2, p. 159.

10. The petitioner claims that it should be allowed to deduct from its gross income for 1918 the amount of additional corporation excise taxes for the years 1909 to 1912, inclusive, which it paid in the latter year, and perhaps it claims also the right to deduct additional income taxes for the years 1914 to 1916, inclusive, which it paid in the year 1918. It further contends that its surplus as of the beginning of the year 1918 should not have been reduced on account of these additional taxes.

Section 234(a) (3) of the Revenue Act of 1918 allows the deduction of " Taxes paid or accrued within the taxable year imposed (a) by the authority of the United States, except income, war-profits and excess-profits taxes." Thus, the additional income taxes for the years 1914 to 1916, inclusive, are clearly not deductible. The petitioner kept its books upon an accrual basis, and the question as to the excise taxes depends upon whether or not these taxes accrued within the year 1918.

In *United States* v. *Anderson*, 269 U. S. 422, at page 441, the Supreme Court of the United States stated:

Only a word need be said with reference to the contention that the tax upon munitions manufactured and sold in 1916 did not accrue until 1917. In a technical legal sense it may be argued that a tax does not accrue until it has been assessed and becomes due; but it is also true that in advance of the assessment of a tax, all the events occur which fix the amount of the tax and determine the liability of the taxpayer to pay it. In this respect, for the purposes of accounting and of ascertaining true income for a given accounting period, the munitions tax here in question did not stand on any different footing than other accrued expenses appearing on appellee's books. In the economic and bookkeeping sense with which the statute and Treasury decision were concerned, the taxes had accrued. It should be noted that Section 13 (d) makes no use of the words " accrue " or " accrual " but merely provides for a return upon the basis upon which the taxpayer's accounts are kept, if it reflects income—which is precisely the return insisted upon by the Government. We do not think that the Treasury decision contemplated a return on any other basis when it used the terms " accrued " and " accrual " and provided for the deduction by the taxpayer of items " accrued on their books."

Under this decision the petitioner's contention that the taxes here in controversy could not have accrued prior to the year 1918, since they were not assessed against it until that time, must fail. All of the events which fixed the amount of this tax and determined the liability of the taxpayer to pay occurred prior to the year 1918. The taxes, therefore, accrued prior to the year 1918. The situation is not changed by the fact that the statute of limitations on refunds for prior years will prevent the taxpayer from getting any deduction on account of these additional taxes. See *United States Trust Co. of New York*, 13 B. T. A. 1074; *Ernest M. Bull, Executor*, 7 B. T. A.

993; *Kossar & Co.*, 16 B. T. A. 952. Cf. *Petaluma & Santa Rosa Railroad Co.*, 11 B. T. A. 541.

Since these taxes accrued in prior years, they were liabilities of the company at the beginning of the year 1918. We therefore approve the respondent's action in disallowing the deductions and in reducing invested capital.

11. The petitioner claims that the respondent erred in reducing its invested capital for the years 1918, 1919, and 1920 by the amounts of Federal income and profits taxes alleged to have been due for the years 1917, 1918, and 1919. This point is disposed of by the provisions of section 1207 of the Revenue Act of 1926, which sustains the determination of the respondent. *Russel Wheel & Foundry Co.*, 3 B. T. A. 1168.

12. The last question relates to the proper method of deducting cash discounts. We have not been informed as to the exact circumstances or conditions under which the petitioner allowed the cash discounts in question. The witness once referred, probably inadvertently, to the discount as a trade discount, but from the entire record we are satisfied that it is not a trade discount. The two are different and different results may follow. A trade discount is the difference between a seller's list prices for his goods and the amount at which he sells those goods to the trade. A cash discount has a very definite meaning also. It is a deduction from the price at which the goods are billed to the purchaser which the seller allows for settlement of the bill within a certain stated time. When goods are sold subject to a trade discount, the seller knows positively that the customer's remittance will not include the amount of the trade discount. The situation in regard to a cash discount is entirely different, in that at the time of the sale, and until the expiration of the specified period thereafter, or until settlement, the seller does not know the extent, if any, to which the purchaser will take advantage of a cash discount.

Cash discounts may be deducted as ordinary and necessary expenses under section 234(a) (1) of the Revenue Acts of 1918 and 1921. But the question remains as to whether the net addition to a reserve for cash discounts is the proper deduction for any taxpayer using an accrual system, or whether the cash discount actually allowed for any year is the proper amount to deduct. Reserves for liabilities which at the end of the year are still contingent are not deductible even under an accrual system, because all of the events necessary to fix the taxpayer's liability and the amount thereof have not happened. *United States* v. *Anderson, supra.* See also *William J. Ostheimer*, 1 B. T. A. 18; *Uvalde Co.*, 1 B. T. A. 932.

On the authority of its earlier decisions the Board decided in *M. I. Stewart & Co.*, 2 B. T. A. 737, that reserves for cash discounts

are not proper deductions for one on the accrual basis. This was obviously correct for both the fact and the amount of liability are uncertain at the end of the year and, therefore, nothing is accrued. As the result of this last decision, the Commissioner issued G. C. M. 1342, published in C. B. VI–1, p. 7, stating that reserves for cash discounts were not deductible, but that cash discounts actually allowed during the year were proper deductions. In *Jackson Casket Manufacturing Co.*, 7 B. T. A. 1190, and in *Landesman-Hirschheimer Co.*, 15 B. T. A. 64; affd., 44 Fed. (2d) 521, the Board followed its previous decision and held that cash discounts actually allowed should be deducted rather than the net additions to a reserve for cash discounts. However, in *National Straw Works*, 16 B. T. A. 463, the Board allowed a reserve for cash discounts to be deducted. This latter case, in so far as it holds that an addition to a reserve for cash discounts is a proper deduction, is overruled. The case of *J. B. Jemison*, 18 B. T. A. 399, is distinguishable on its facts. We hold that the petitioner in the present case is not entitled to deduct the net addition to a reserve for cash discounts for each respective year, but is entitled to deduct the cash discounts actually allowed in each respective year.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

Trussell dissents.