*1021 OPINION.
Milliken :
The facts of these proceedings were either stipulated or consist of admissions made by respondent in his pleadings.
These proceedings inyolve two distinct classes of issues: those which relate to taxable income, and those which relate to invested capital. We will first dispose of the issues relating to taxable income.
Issue 1. Respondent refused to permit petitioner to deduct from gross income amounts paid by it to the United States as penalties for the violation of certain Federal statutes which are referred to in the findings of fact. This question was before us in Great Northern Railway Co., 8 B. T. A. 225, and there we found adversely to petitioner’s contention. Petitioner requests us to overrule that decision and submits an elaborate argument in behalf of its contentions. We gave mature consideration to the question at the time that proceeding was decided and petitioner has not convinced us that we should now recede therefrom.
Issue 2. Petitioner complains that respondent credited its operating expenses for the years 1916 and 1917 in amounts representing expenses of transportation for investment. The facts, with reference to this contention, were not stipulated. Respondent in his answer denied the allegations of the petitions and followed his denials with an admission which we have incorporated in our findings of fact. The facts as found are quite meagre and are not sufficient to bring before us the contention vigorously urged by petitioner in the brief filed in its behalf. However, the contentions urged were considered by us in Cheat Northern Railway Co., supra, where the facts appeared at length and were there decided adversely to the petitioner’s *1022 contention. To the decision in that case we adhere. Respondent did not err in crediting operating expenses for the j^ears 1916 and 1917 the amounts representing expenses of transportation for investment.
Issue 6. During the years 1916 and 1917, petitioner collected $4,480.33 and $8,360.22, respectively, in excess of passenger fares as fixed by its tariffs. These amounts resulted from the agent’s errors in computing the correct fares for passengers. Since the names and addresses oif the passengers so overcharged were not known, it was impossible to make refunds. The amounts received by petitioner were paid for the right to travel over its road. They were income unless the fact that the overcharges were unlawful takes these items out of that category. That such is not the case see United States v. Sullivan, 274 U. S. 259. We can perceive no difference between an undercharge and an overcharge in this respect and we know of no provision in the Revenue Acts which requires a railroad to report a whole charge where it received only a part. The record is dear that it is impossible to discover to whom refunds should be made. The obligation to repay will not in the nature of things be discharged and from a common sense viewpoint the money will remain the property of petitioner subject to its free use and enjoyment. The Interstate Commerce Commission no doubt realizing this requires “ unrefundable overcharges ” to be cleared to profit and loss. Respondent did not err in including the above amounts in gross income.
Issue 7. During each of the years in question petitioner credited to profit and loss pay checks, checks or vouchers in payment of loss and damage claims, pay rolls, and for various other ordinary and necessary expenses which had in previous years been issued and had not for a period of two years been presented for payment. The checks when issued were charged out to operating expenses, deducted and allowed as a deduction by respondent in the determination of taxable income. Petitioner allowed two years to intervene and if the checks had not been presented for payment it credited the same to profit and loss. Respondent in auditing the returns added such sums to income.
Petitioner does not claim that the deductions theretofore allowed by reason of these checks should be restored to taxable net income for the earlier years, but desires to retain the benefit of the same. Neither has petitioner advanced any suggestion as to when, if ever, any adjustment should be made for the checks uncashed. We assume it to be the position of petitioner that such adjustment would never be made. Section 13(d) of the Revenue Act of 1916 and section 212 of the Revenue Act of 1918 provide a latitude as to the manner in which books of account may be kept in order to reflect taxable income. The books of petitioner were kept and maintained on the accrual basis during all of the years in question and pursuant to the sections *1023 of the statutes aforesaid. It was permitted to deduct expenses for which checks were issued regardless of the date of the cashing of the checks by the parties to whom issued. After two years had elapsed the checks were credited to a profit and loss account. Petitioner followed this course in order that its boobs of account might reflect a true and accurate state of affairs. The Interstate Commerce Commission authorized and required such procedure. So far as we are advised this has been the uniform and consistent practice of petitioner in treating such items. If subsequent events, due to the failure to cash the checks show such charges to have been in error, petitioner restored the same to income, thus correcting what had been theretofore eliminated therefrom. We should be very cautious in disturbing such a consistent practice pursued by petitioner and one having the sanction of the Interstate Commerce Commission. Any large business enterprise, especially a common carrier, should adjust its income accounts so as to be an accurate reflection of income.
It is undisputed that in a strict legal sense, petitioner has not derived income. Eisner v. Macomber, 252 U. S. 189. As a basis, however, for the determination of taxable income and based upon the actualities of an ever recurring situation, it must be held that the treatment by petitioner in charging the amounts here in question to profit and loss has the sanction of common sense and may thus enter into the computation of taxable income for the years in question. Cf. Yale & Towne Manufacturing Co. v. United States, 269 U. S. 422, and American National Co. v. United States, 274 U. S. 99.
Petitioner also submits that if, after two years, the person to whom the checks were issued submits them for payment, they are honored. The system of accounting employed by petitioner will logically take care of this situation and the resx>ondent agrees that there would thus arise a deduction from income on account thereof. It is .also significant to note that in the years before us none of the checks of the character above referred to are in question. In reaching our conclusion, we have not failed to take into consideration the fact that bookkeeping entries do not constitute income. Doyle v. Mitchell Bros. Co., 274 U. S. 179. Rather are we persuaded by a system of accounting long in use, recognized as good accounting and required by the Interstate Commerce Commission, and which, under all the facts at hand, resulted in the reflection of true income for the several years.
Petitioner cites in support of its position the decision of the United States Supreme Court in Bowers v. Kerbaugh-Empire Co., 271 U. S. 170. The case at bar is distinguishable. We are not here concerned with a single isolated transaction, but with an ever recurring one in the business of petitioner, the net result of which is not a loss, but, from a practical viewpoint, is a definite gain. Respondent was not in error in adding the amounts in controversy to taxable income.
*1024 Issue 10. Petitioner in its amended answer filed June 12,1928, seeks to transfer from the year 1915 to the year 1917 a loss of $5,960,960.08 arising from its transactions with the Chicago, Rock Island & Pacific Railroad, an Iowa corporation. It is stipulated that in December, 1909, the Iowa corporation needed $7,314,660.83 to retire certain of its outstanding bonds, and that “To provide this amount petitioner advanced said sum to the Iowa corporation as a loan and received therefor $7,500,000 par value of the Iowa company’s 5 per cent Debenture Bonds maturing September 1, 1913.” In November, 1914, petitioner delivered back $1,388,000 par value of these debenture bonds to the Iowa company and received in lieu thereof $1,353,699.75, leaving a balance due to petitioner of $5,960,961.08. In June, 1915, the book value of the debenture bonds of the Iowa corporation owned by petitioner was written down to $1 and the balance, $5,960,960.08, was written off to Profit and Loss by petitioner’s receivers. Said debenture bonds themselves were worthless in June, 1915. It is further stipulated that petitioner’s receivers deducted said loss on their tax return on behalf of petitioner for the year 1915, but that on or about January 21, 1928, petitioner filed an amended return for 1915, in which said deduction was not taken.
Section II G (b) of the Act of October 3, 1913, grants to corporations the right to deduct from gross income “ all losses actually sustained within the taxable year and not compensated by insurance or otherwise, * * The question presented is, Did petitioner actually sustain a loss in 1915 in respect to its loan to the Iowa company? In this connection it is pertinent to point out that the deduction was taken in a tax return made after the end of 1915, and that the stockholders’ proceeding against the directors and petitioner was begun in February, 1915. The receivers, with knowledge of that proceeding, deliberately charged off of petitioner’s books a debt of nearly $6,000,000, and deducted the same loss in their income-tax return. The reasons for this procedure are obvious — the Iowa company, which owed the debt, was insolvent; its bonds were worthless; the debt was worthless-. The fact that a few stockholders were pursuing some of petitioner’s directors, charging fraud, does not militate against the fact that petitioner sustained an actual loss in the year 1915. Whether such fraud would be established was entirely problematical. In fact, to this day, no such fraud has been found or decreed by any court; nor has such fraud been confessed. The directors offered to pay to petitioner or to its receivers less than one-eleventh of the principal amount involved, to say nothing of interest for over 7 years. There is nothing in the record which indicates that the directors were not financially able to pay the whole amount. It seems evident that this comparatively small amount was paid, not as a confession of wrongdoing, but to procure the dismissal of an annoy *1025 ing proceeding. If the court had thought the claim valid, it certainly would not have approved the acceptance by its receivers of this offer. If the receivers had thought that there was any merit in the claim they would not have written the debt off in 1915. They were not required to be “incorrigible optimists.” United States v. White Dental Co., 274 U. S. 398. Respondent is sustained on this point.
Issue 11. The sum of $68,583.27 received by the reorganization committee as interest on its daily bank balance was undoubtedly taxable income. The question is, To whom was such income taxable? We may at once eliminate the individual members of the committee and the committee as an organization. Neither was entitled to the interest. The committee received the amounts paid by the stockholders and other depositors for specified purposes. This leaves only the various depositors which included the subscribing stockholders and petitioner. Under the “Plan of Reorganization,” the stockholders were to subscribe and pay for the 7 per cent preferred stock at par, the payments to be made through the committee. Whenever a stockholder made a deposit his only specified right was to receive the stock for which he had subscribed. It seems conceded that such stockholders had no right to the interest. There is nothing either in the agreement or the plan of reorganization which makes any provision for them in this respect. No part of the interest was paid to them. This was the construction placed on the plan and the agreement by the parties themselves. Petitioner points out that it is stipulated that petitioner was not a party to the agreement. This does not conflict with the fact that the agreement was made for its benefit, that it was the sole beneficiary thereof, nor with the fact that other agreements may have been entered into between petitioner and the committee. In fact, it was first stipulated that “the railway company was not a party to the agreement in any manner” and by a subsequent stipulation the words underscored were eliminated. The record discloses that petitioner contributed to the committee $838,-194.44 from its own funds and that there was paid to the committee $5,500,000, which was received from the directors as the result of the stockholders’ suit, and which clearly belonged to petitioner. It is stipulated that the committee purchased bonds of the consolidated Indiana Coal Co. and paid therefor $2,022,011.85, and that “the funds for said purchase were furnished by petitioner.” Finally, it is stipulated that after all expenditures had been made by the committee a small sum, less than $1,000, was returned to petitioner. Since provision was not specifically made in the plan or the agreement of reorganization for any of these transactions, there must have been other agreements between the committee and petitioner or petitioner’s receivers not provided for in the plan. What these agree *1026 ments were is not disclosed. It is sufficient to point out that every expenditure made by the committee redounded to the benefit of petitioner. The amounts which were paid by the committee for services and expenses were just as much for petitioner’s benefit as though expended by petitioner itself. Under all the facts of the record, we are of the opinion that since petitioner was the sole beneficiary of the funds held by the committee, the interest on these funds constituted taxable income to it. Cf. Irwin v. Gavit, 268 U. S. 161. Respondent did not err in including this interest in petitioner’s gross income.
Issues 14, 15, and 16. These issues relate to interest, rentals and compensation earned by petitioner during Federal control during the years 1918 and 1919, but which were paid by the Director General in a subsequent year. Since petitioner was on an accrual basis these amounts constitute taxable income in the year earned and its contentions must be resolved in its favor on the authority of Texas & Pacific Railway Co., 9 B. T. A. 365; Cf. Illinois Terminal Co., 5 B. T. A. 15; New Orleans, Texas & Mexico Railway Co., 6 B. T. A. 436; and Great Northern Railway Co., supra.
Point 17. During the period April, 1915, to June, 1917, petitioner, through the reorganization committee, purchased from the public the outstanding bonds of the Consolidated Indiana Coal Co. of the face value of $2,336,000, for which it paid the sum of $2,022,011.85. During the year 1918 petitioner acquired all the capital stock of the Coal Company and for that part of 1918 during which such ownership existed it included the Coal Company in its consolidated return. The Coal Company retired said bonds during the period of affiliation whether by cancellation or payment and, if by payment, at what amount does not appear. On these facts respondent has determined that the affiliated group was in receipt of income to the extent of $313,988.15, which was the difference between the par value of the bonds and the amount paid for them by petitioner during the period 1915-1917.
It is clear petitioner made no gain at the time it purchased bonds at a discount; neither did the Coal Company lose anything by reason of the transaction. No funds of either company were used during the period of affiliation to purchase the outstanding obligations of the Coal Company. It appears that there was no affiliated group in existence at the dates of the purchases to which the purchases might be attributed. Petitioner, as a distinct taxable entity, purchased the bonds and subsequently brought them into the affiliation, at which time they became intercompany obligations, the payment or collection of which produced neither income nor loss. Cf. Gould Coupler Co., 5 B. T. A. 499; Farmers’ Deposit National Bank, 5 B. T. A. 520; H. S. Crocker Co., 5 B. T. A. 537; Buffalo Forge Co., 5 B. T. A. 947. If it be conceded that the situation is the same as though the *1027 bonds had been purchased during the period of affiliation, no taxable income was derived from the transaction. See Independent Brewing Co. 4 B. T. A. 870; New Orleans, Texas & Mexico Railway Co. supra; Houston Belt & Terminal Ry. Co. 6 B. T. A. 1364; National Sugar Manufacturing Co. 7 B. T. A. 577. The amount of $313,988.15, being the difference between the par value of the Coal Company’s bonds and what was paid for them, should be excluded from petitioner’s gross income for 1918.
Issues 3, 4, and 5. We have reserved the question of deduction of amortized discount and expenses for the reason that it is so intimately connected with invested capital that both issues should be discussed together and in the order in which they arise.
Petitioner complains that respondent erred in refusing to permit the deduction from its gross income of any part of the discount and expense incurred in connection with the sale of its First and Refunding Bonds sold during the period 1904-1908; and further, that although respondent allowed as a deduction an amortized part of the discount on its Equipment Bonds which matured serially and on its Collateral Trust Bonds issued in 1902, which also matured serially, he erred in his method of computing such amortization.
Respondent in the instance of the First and Refunding Mortgage 4% Gold Bonds which were issued and sold during the years 1904 to 1908 refused to allow any part of the discount and expenses applicable thereto for the reason that on the books of account of petitioner the discount and expenses were charged to profit and loss or surplus account prior to January 1, 1909. If, however, petitioner had charged the discount and expenses on its books to a reserve for “ unamortized discounts and expenses on bonds ” he would, pursuant to his regulations promulgated on the subject, have allowed the deductions now claimed for the years in question and also if the bonds had been issued at a discount subsequent to January 1, 1909, a deduction would have been allowed notwithstanding the manner in which it was reflected on the books of account. Apparently, therefore, the controlling factor is the manner in which the discount was reflected upon the books of account. We can see no merit in the respondent’s action in so far as it is dependent upon the manner in which the account is reflected upon the books. Bookkeeping entries can not control over the actual facts, and if necessary they should be corrected to correspond with the true facts. If the bond discount is to be disallowed as a deduction the denial must rest on more substantial grounds.
Both parties refer to Old Colony Railroad Co., 6 B. T. A. 1025. Petitioner insists that our decision in that case is in conflict with respondent’s regulations and with the accepted rules of accounting *1028 practice. On the other hand, respondent contends that if we follow Old Colony Railroad Co., supra, then all allowances made by him on account of deductions with respect to amortized discount and expense should now be disallowed, and that any premiums received by petitioner on the sale of any of its obligations should receive like treatment.
In Old Colony Railroad Co., supra, we held that no part of premiums received on bonds sold by the railroad during the period 1895-1904 was taxable in the year 1920 for the reason that no transaction occurred in that year with reference to the sale, purchase or payment of the bonds, arid followed this with the statement that if the bonds had been sold at a discount no part of such discount would be deductible in that year. Respondent appealed from our decision to the Circuit Court of Appeals for the First Circuit. In its opinion rendered on May 31, 1928, 26 Fed. (2d) 408, the court, after quoting the Sixteenth Amendment and the applicable provisions of the Revenue Act of 1918, said:
Article 544 of Regulations 45, based upon tbe Revenue Act of 1918, provides:
(2) (a) If bonds are issued by a corporation at a premium, tbe net amount of sueb premium is gain or income wbicb should be prorated or amortized over tbe life of tbe bonds.
(3) (a) If bonds are issued by a corporation at a discount, tbe net amount of sucb discount is deductible and should be prorated or amortized over the life of the bonds.
It is to be borne in mind that the premiums here in question were received by the Old Colony not later than 1904 and during a period of time when there was no Federal statute authorizing the laying and collection of taxes on incomes, and several years prior to adoption of the 16th Amendment (February 25, 1913) authorizing Congress to lay and collect taxes on incomes without apportionment among the several states; and that these premiums when received were regarded and treated as capital and expended in the improvement of its road.
The question then is whether the premiums that were received by the taxpayer not later than 1904, are income of the taxpayer that may be amortized over the life of the bonds and the sum or part of the premiums apportioned to the year 1920 be taxed in 1920 to the taxpayer as a part of its income in that year under Sec. 213 (a) and 212 (b) of the Revenue Act of 1918.
If it be assumed that the premiums received in 1904 and prior thereto were income, can they be said to be taxable income “ for the taxable year in which received by the taxpayer” (Sec. 213 (a)), “which should be prorated or amortized over the life of the bonds” (Art. 544, Reg. 45, 2 (a)). It seems to us that the answer to this question disposes of the case, and that the answer must be in the negative. The premiums, when received, were treated and used as capital. They were not received in 1920, the tax year in question, but some 16 or more years prior thereto. At that time there was no Federal statute imposing a tax upon incomes and no provision of the Constitution giving Congress power to lay or collect taxes on incomes without apportionment, which the Revenue Act of 1918 unquestionably does. It is not to be presumed that Congress by the Act of 1918 intended to tax the whole or any part of the premiums on bonds received prior to February 25, 1913, whether the life of the *1029 bonds extended into a taxable year subsequent to February 25, 1913, or not, as it was beyond its power to do so at the time they were received. See Lynch v. Turrich, 247 U. S. 221; Southern Pacific Co. v. Lowe, 247 U. S. 330; Doyle v. Mitchell Bros Co., 247 U. S. 179; Hays v. Cauley Mountain Coal Co., 247 U. S. 189; Merchants' Loan & Trust Co. v. Smietanka, 255 U. S. 509; Goodrich v. Edwards, 255 U. S. 527.
This question, as we understand it, has not heretofore been passed upon by any court A somewhat analogous question was decided by the Court of Claims, in the case of Chicago and Alton Railroad Co. v. United States, 53 Ct. Cl. 41. There the corporation in 1906 issued and sold its bonds at a discount and the amount of the discount was entered in a “Profit and Loss” account of that year. In 1909 the Corporation Excise Tax Act was enacted. In filing its returns for 1911 and 1912 under that Act, the corporation did not claim deductions for the discount, but later filed claims for refunds for those years of a proportionate amount of the discount. The Commissioner rejected the claims for refunds and the Court of Claims approved his decision. The significant thing about the case is that the court declined to allow the taxpayer, who has sustained a loss in 1906 in the amount of discount then made in the sale of bonds extending over a period of years, to have such loss amortized and allowed as a deduction in determining the amount of the taxpayer’s tax for the years 1911 and 1912.
The decision of the Board of Tax Appeals is affirmed.
It will be observed that tbe court had before it for decision the sole question whether any part of premiums received prior to March 1, 1913, was taxable in the year 1920. This issue the court decided in the negative. Whether discount incurred in the sale of bonds prior to March 1, 1913, should receive like treatment was not before the court. Neither was it before us when we decided the case. What was said by the court and what was said by us in respect of this issue was merely dicta. The Circuit Court of Appeals in affirming the decision of the Board primarily based its decision on the fact that the bond premium was received prior to February 25, 1913, and that it was beyond the power of Congress to tax the whole or any part of the premiums so received, regardless of whether the life of the bonds extended into a taxable year subsequent to the enactment of the Sixteenth Amendment to the Constitution. The effective date of the latter is set up as dead line beyond which the Commissioner may not go in the collection of a tax on income received prior thereto. This reasoning does not apply, however, in the instance of bonds issued at a discount prior to February 25, 1913, and the life of the bonds extending into the years here in controversy.
What is income is controlled by the Constitution, while deductions are a statutory concept. In the years before us, the petitioner was on an accrual basis for the reporting of income, not only because that was the system necessary to reflect true income, but because the Interstate Commerce Commission required such a basis. Income realized before the adoption of the Sixteenth Amendment may not thereafter be taxed, but as concerns deductions from income, the *1030 same rule does not necessarily apply. In the case of a continuing transaction, even though it had its inception prior to February 25, 1918, there may arise statutory deductions from income which a taxpayer is not deprived of by reason of the date of the enactment of the Sixteenth Amendment. The basis of reporting income and the reflection of true income may control in the instance of deductions. The basis of petitioner for reporting income was the accrual basis and for the purposes of Federal taxation the year 1916 was the first year pursuant to section 13(d) of the Revenue Act of 1916, that such a change could lawfully be made, and coincident with such a change in the reporting of income there arose a right to deductions not theretofore permitted on a strict cash receipts and disbursements basis. The accrual basis may permit the taking of a loss and the spreading of the same ratably over the years, in order that true income may be reflected. Especially is this so in a business presenting the accounting perplexities of petitioner. It also is pertinent to point out that the case of Chicago & Alton Railroad Co. v. United States, 53 Ct. Cls. 41, referred to in both opinions, involved the application of the provisions of the Corporation Excise Tax Act of 1909, which, broadly speaking, taxed as net income only income actually received less expenses actually paid and losses actually sustained and which contained no provisions similar to those of the Revenue Act of 1916 and subsequent Revenue Acts permitting the return of income on an accrual or other basis. The decision of the Court of Claims as construed by the Circuit Court of Appeals held that discount incurred was a loss in the year the bonds were issued. On the other hand, the Circuit Court of Appeals for the Third Circuit, in Baldwin Locomotive Works v. McCoach, 221 Fed. 59, where the issue was whether any part of discount on bonds issued in 1910 and payable in 1940 could be deducted in the year of issuance, held that no loss was sustained until the bonds were paid. This latter case also had for application the Corporation Tax Act of 1909 and in it the issue was squarely presented and decided. The decision in the latter case lays down what we believe to be the true rule, since one on a cash basis can not be held to have made income until he is in either actual or constructive receipt thereof nor to have sustained a loss or incurred an expense until he has actually sustained the loss or paid the expense. One on a cash basis sustains no deductible loss on bonds issued at a discount in the year of issuance. The only question is can one on an accrual basis spread such discount over the life of the obligation involved and take as a deduction an aliquot part thereof each year or must he, like one on a cash basis, wait'until the obligation is paid before he is entitled to any deduction whatever. It is obvious that to hold the latter solution correct *1031 is to annihilate, in this respect, the difference between these methods of accounting.
Respondent’s regulations, beginning with articles 149 and 150 of Regulations 33 (Revised), (with an exception which we will refer to later) have consistently provided that discount on bonds issued by a taxpayer should be prorated over the life of the bonds and an aliquot part thereof be deducted from gross income each year. See article 544, Regulations 45, and article 545 of Regulations 62, Regulations 65 and Regulations 69. These regulations have been in effect for over 10 years and have been applied by respondent in all cases of discount on bonds so)d except as provided in article 149, Regulations 33, which will be noticed later. Under these circumstances these regulations should not be lightly disregarded unless they are in conflict with the provisions of the statute. It is significant that they are in harmony with general accounting practice, which treats discount as deferred interest to be spread over the life of the obligation. Further, they coincide with general business usage. Whenever a corporation contemplates issuing long-term securities, three methods present themselves: Shall the bonds carry the market rate of interest and be issued at par, or shall they carry a greater rate than the market rate and be sold at a premium, or shall they carry a rate less than the market rate and be so)d at a discount? Which of these methods should be pursued is determined by the present needs and the future prospects of the company, but it matters not which plan is adopted, other things being equal, the rate of interest finally paid will be the market and not the contract rate. The true income of the company can be reflected only when the discount is spread over the life of the bonds. The most material element in determining the contract rate of interest, that is, whether the bonds shall be sold at par or at a premium or discount, is time. Thus no one would consider the proposition that he pay a premium for bonds payable at once nor would one issue bonds at a discount which are due and collectible the day they are issued. Since time is such a vital element in determining premium and discount, it is difficult to perceive why this element should not be taken into consideration in determining taxable income — ■ why time should not be used as a divisor in order to allocate to each period of time that part of the discount which is greater or less by reason of time.
The question remains, Is this method, which is in harmony with general accounting practice and w,ith business usage, in conflict with the Revenue Acts of 1916 and 1918? Section 13(d) of the Revenue Act of 1916 provides:
(d) A corporation * * *, keeping accounts upon any basis other than that of actual receipts and disbursements, unless such other basis does not *1032 clearly reflect its income, may, subject to regulations made by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury make its return upon the basis upon which its accounts are kept, in which case the tax shall be computed upon its income as so returned.
Section 212(b) of the Revenue Act of 1918, which is made applicable to corporations by section 232, provides in part:
(b) The net income shall be computed * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income. * * *
Section 200 of the Revenue Act provides that the term M paid ” includes “ paid or accrued.” In United States v. Anderson, 269 U. S. 422, the Supreme Court had before it for application section 13(d) of the Revenue Act of 1916. The court quoted Treasury Decision 2433, which in part provides that under this section that it—
will be permissible for corporations which accrue on their books monthly or at other stated periods amounts sufficient to meet fixed annual or other charges to deduct from their gross income the amounts so accrued, provided such accruals approximate as nearly as possible the actual liabilities for which the accruals are made, and provided that in cases wherein deductions are made on the accrual basis as hereinbefore indicated, income from fixed and determinable sources accruing to the corporations must be returned, for the purpose of the tax, on the same basis.
After pointing out that the Corporation Tax Act of 1909 and the Revenue Act of 1913 provided “ in terms that net income should be ascertained by deducting from gross income received, interest, expenses and taxes actually paid and losses actually sustained,” and after stating that the difficulty ,in administering these Acts resulted in the promulgation of certain regulations which permitted to a limited extent the return of income on an accrual basis and that section 13(d) went much further than these regulations, the court said:
Treasury Decision 2433, to which reference has been made, was in harmony with this view of section 13(d). It recognized the right of the corporation to deduct all accruals and reserves, without distinction, made on the books to meet liabilities, provided the return included income accrued, and, as made, reflected true net income. If the return failed so to reflect income, the regulation reserved the right of the Commissioner to require the return to be made on the basis of receipts and disbursements.
A consideration of the difficulties involved in the preparation of an income account on a strict basis of receipts and disbursements for a business of any complexity, which had been experienced in the application of the Acts of 1909 and 1913 and which made it necessary to authorize by departmental regulations, a method of preparing returns not in terms provided for by those statutes, indicates with no uncertainty the purpose of sections 12(a) and 13(d) of the Act of 1916. It was to enable taxpayers to keep their books and make their returns according to scientific accounting principles, by charging against income *1033 earned during the taxable period, the expenses incurred in and properly attributable to the process of earning income during that period; and indeed, to require the tax return to be made on that basis, if the taxpayer failed or was unable to make the return on a strict receipts and disbursements basis.
We are of opinion that in an economic and accounting sense, the discounts, herein involved, are in the nature of deferred interest, that they may be accrued and that the proper proportionate part applicable to each taxable year involved may be taken as a deduction from gross income in such year, and that this concept is not in conflict but rather in harmony with the provisions of the Revenue Acts of 1916 and 1918. This view is not in conflict with Baldwin Locomotive Works v. McCoach, supra; Chicago & Alton Railroad Co. v. United States, supra, nor New York Life Insurance Co. v. Edwards, 271 U. S. 109, since the first two cases involved, as above pointed out, the Corporation Excise Tax Act of 1909 and the last the Revenue Act of 1913, both of which recognized only the cash receipts and disbursements basis. There is another vital distinction between the New York Life Insurance Co. case and this proceeding. In that case the insurance company sought to amortize premiums paid by it on bonds of others bought by it, while in this proceeding petitioner seeks to amortize discount on its own bonds. In the New York Life Insurance Co. case, the court said:
The company owned many bonds, etc., payable at future dates, purchased at prices above their par values, and to amortize these premiums a fund was set up. It claimed that an addition to this fund should be deducted from gross receipts. The District Court thought the claim well founded, but the Circuit Court of Appeals took another view. Unless the addition amounted to a loss “ actually sustained within the year ” no deduction could be made therefor. Obviously, no actual ascertainable loss occurred. All of the securities might have been sold thereafter above cost. The result of the venture could not be known until they were either sold or paid off.
In that case the insurance company could shift the loss or perhaps make a profit. Here petitioner was bound to pay the discount. It is true the possibility existed that petitioner might become insolvent and obtain relief in paying its bonds at less than par, but we have no more right to anticipate such a situation here than to hold that no income or loss occurred in the taxable year because loss or income was made in the succéeding year. If we indulged in such prognostications in all cases the accrual system of accounting would be set at naught.
It is pertinent at this period to state that respondent has denied petitioner'the right to deduct amortized discount on all bonds sold prior to the year 1909. This is in accord with article 149 of Regulations 33 (Revised). This regulation was based on what we con *1034 ceive to be an erroneous interpretation of the decision in Chicago & Alton Railroad v. United States, supra. That decision, as we understand it, was not based so much on the fact 'that the bonds were issued prior to the effective date of the Corporation Excise Tax Act as on the fact that that Act recognized only the cash basis. However this may be, this exception is not to be found in any of respondent’s subsequent regulations, and is contrary to what we conceive to be the true rule. We hold, therefore, that petitioner is entitled to deduct in each taxable year that proportion of the discount on the bonds involved in issues 8, 4, and 5, which is obtained by dividing the total discount by the number of years the bonds are to run.
This brings us to the question whether respondent used the proper method in computing the amortization of discount on petitioner’s bonds which matured serially. Respondent computed the discount on these bonds under the formula laid down by him in IT 1412, Cumulative Bulletin 1-2, p. 91, which is as follows:
Where bonds mature serially a proper proportion of the total expense of floating the bonds should be allocated to each series and each series then treated as a separate unit. The deduction applicable to each series should be prorated equally over the life of the bonds constituting the series, provided, however, that if the corporation retired any of the bonds before maturity, the deduction for that year should be increased by an amount equivalent to the amount which would ordinarily be deducted during the succeeding years on account of those particular bonds if they had not been prematurely retired.
Petitioner contends for the method prescribed by the Interstate Commerce Commission and which respondent has now adopted (see G. C. M. 3832, I. R. B., vol. VII, No. 22, p. 3), which is as follows:
* * * # * * *
The amount of each series of bonds should bo multiplied by the number of years it has to run, the product representing an amount equivalent to the series as though outstanding for one year.
To any series of bonds should be allocated that proportion of the total discount (or premium) which the product for such series bears to the sum of the products for all the series.
The portion of the discount (or premium) thus applicable to any series of bonds should then be prorated equally over the life of the bonds constituting such series.
* * * * * * *
Since we are treating discount as deferred interest, the formula contended for by petitioner and now adopted by respondent, in our opinion, coincides with such concept.
The next question under these three issues is whether respondent erred in refusing to deduct an amortized part of the expense incurred in issuing its First and Refunding Bonds, the last of which were sold in 1908. Here we have no question of deferred liability, but the *1035 payment of an expense made prior to March 1, 1913. Waiving for the moment the question how such expenses should be treated if made subsequent to such date, we are of opinion that since the Circuit Court of Appeals has held in the Old Colony Railroad Co. case, supra, that premiums actually received prior to March 1, 1913, are nSt taxable income, by the same token, expenses actually paid prior to said date are not deductible from gross income of taxable years. Respondent did not err in refusing this latter deduction.
At this point respondent affirmatively pleads that he erred in allowing the deduction of any amortized part of the expense paid in connection with any of the issues of bonds by petitioner. With the exception of bonds issued prior to March 1, 1913, the facts as stipulated, do not show that there was any expense incurred in selling any other bonds. However, it is stated in the briefs filed in behalf of both petitioner and respondent that petitioner incurred bond expenses in 1917 and 1919 in the respective amounts of $48,260.50 and $53,610.25 and that respondent has allowed as deduction an amortized part of such expense. Since respondent has by his amended answer opened this phase of the case and since the parties are agreed upon the facts, we will now determine whether respondent’s action in this respect was proper. Respondent draws a distinction between discount and such expenses and contends that unlike discount, such expenses do not partake of the nature of interest since they were paid to persons other than the lenders of the money. We are not impressed by this contention. While such expenses do not so nearly coincide with the concept of interest, they are, nevertheless, intimately connected with the loan and in fact constitute a part of the cost of the money borrowed. We see no reason for divorcing them from the loan and holding them annual expenses. In Emerson Electric Manufacturing Co., 3 B. T. A. 932, we held that commissions paid to brokers for the sale of capital stock of a corporation were not deductible as ordinary and necessary expenses of carrying on a trade or business, and in this connection, we said:
* * * Further, it is clear to us that the revenue of a day or a year should not be burdened with the cost of acquiring additional capital, the benefits from which will inure to the corporation over a long period of years. This is the doctrine generally recognized and adopted in the treatment of expenses incident to the procuring of temporary capital through the flotation of bonds and other term securities, and in such cases the expenses are written oft over the life of the indebtedness.
Respondent did not err in respect of the deduction of amortized expenses in connection with the bonds sold in 1917 and 1919.
Issue 9. The facts with reference to this issue are that on July 15, 1912, petitioner sold $20,000,000 par value of its Debenture Bonds for *1036 the sum of $18,800,000, or at a discount of $1,200,000. On July 2, 1917, it exchanged for those debentures its second preferred stock of the same par value. On this latter date the unamortized discount on the debentures amounted to $871,921.20. Petitioner asserts that by this transaction it lost the latter amount and should be permitted to deduct it from its gross income for 1917.
We are aware of the fact that, in accounting, unamortized discount appears on the asset side of the balance sheet as a deferred expense, but it does not follow that such treatment can give' value to what in fact is a liability. Without value there can be no deductible loss. Unamortized discount represents that part of the total discount for which no provision has been made in the way of reduction of surplus or otherwise. It represents not value but liability, the extinction of which, under the facts of the transaction, did not result in deductible loss. Petitioner did not sell its bonds for cash, and with this or money from any other source, pay off the bonds. It exchanged its stock for its bonded liability. This was a purely capital transaction, which did not result in deductible loss or taxable gain. Cf. Simmons & Hammond Manufacturing Co., 1 B. T. A. 803; Emerson Electric Manufacturing Co., supra; H. S. Crocker Co., 5 B. T. A. 538; and Corning Glass Works, 9 B. T. A. 771. Petitioner is entitled to no deduction by reason of this exchange.
Issue 22. During the period 1904-1908, petitioner sold its First and Refunding Mortgage bonds at a total discount of $9,344,167.43 and at a total expense of $256,686.08. The unamortized amount of both discount and expense on December 31, 1916, was $6,036,171.90. The latter amount respondent excluded from invested capital for the year 1917 on the same ground that he had disallowed it as a deduction. For the reasons heretofore given, we are of opinion that respondent did not err in so far as the expenses were concerned. They were actually paid prior to March 1, 1913, and can not be carried beyond that date either for the purpose of deduction or for the purposes of invested capital. In both cases they should be treated alike.
As we have pointed out, discount is in fact a deferred interest charge which is not paid by one on a cash basis until the debt is paid and which may be accrued by one on an accrual basis. Since it appears that the whole discount was charged to profit and loss, at the date of the sale of the bonds, and since this discount should not have been so charged but should have been treated as deferred interest and as such accrued over the life of the bonds, it follows that this charge should be removed with its attendant effect upon surplus. Profit and loss should then be reduced each year by the amortized part of the discount with the final result that surplus instead of being reduced at the outset is reduced in the end by precisely the same *1037 amount. Since the total discount was deducted when the bonds were issued, the true surplus at the beginning of any year is computed by restoring to surplus the unamortized discount. This is the theory and this theory assumes the existence of a surplus. For the purpose of this discussion, we include undivided profits in the term “surplus.” In Willcuts v. Milton Dairy Co., 275 U. S. 215, the court approved the accounting definition of the terms “ surplus and undivided profits,” which is—
Both these terms as commonly employed in corporate accounting denote an excess in the aggregate value of all the assets of a corporation over the sum of all its liabilities including capital stock.
The surplus which may be included in invested capital is an actual, not a paper surplus. Until such a surplus exists, no charge against profit and loss can be reflected in surplus and since nothing is taken from surplus there is nothing to restore. This general rule is, of course, subject to exceptions, one of which is that subsequently a surplus may be paid in or earned in which might be reflected the charge against profit and loss.
In the instant case we are not informed whether petitioner had a surplus, and if so, in what amount, when the bonds were sold. Neither are we informed what effect the period of financial stringency through which it had just passed and the receivership had on its surplus. For all we know, petitioner’s capital may have been impaired, in which case such impairment must have been made good before there could be a surplus. Willcuts v. Milton Dairy Co., supra. On the other hand, we are advised by the record that respondent has restored to surplus certain unamortized discounts. What we hold is that the charge of the total discount against profit and loss made at the time bonds were issued should be removed; that the discount should be amortized over the life of the bonds, with proper charges each year for such amortized part; and that petitioner’s surplus, if any, should not be reduced in this respect by any amount in excess of the amortized discount at the beginning of the taxable year.
Issues 23 and 24. The first of these issues involves the reduction of petitioner’s invested capital for the year 1917 by the amount of the discount incurred in connection with the sale of its Equipment Bonds, Series “G,” issued July 1, 1912, and Series “H,” issued July 1, 1913. Respondent appears to have assumed that the discounts on these bonds had been charged to Investment Account, when in fact they were charged to Profit and Loss Account. The second of these issues involves the contention that respondent erred in computing the amortized discount on Series “ C,” “ D,” “ F,” “ G,” and “H” of its Equipment Bonds issued respectively on April 1, *1038 1909, May 1, 1910, August 1, 1911, July 1, 1912, and July 1, 1913, and on its Collateral Trust Bonds issued May 1, 1902.
Irrespective of the character of entry made when Series {í G ” and “ H ” were issued but subject to the limitation laid down under issue 22, we are of opinion that the unamortized discount on all the above-mentioned bonds should be restored to surplus and that the discount on all the bonds which matured serially should be computed under the formula set forth under issues 4 and 5.
Issues 26 and 29. Under the first of these issues, petitioner contends that respondent erred in reducing its invested capital by the sum of $811,921.26 “ as representing an alleged discount on $64,422,160 par value of stock issued by the taxpayer on July 2, 1917, whereas said stock was issued at par.”
The issue of stock in the amount of $54,422,160 included an issue of second preferred 6 per cent stock in the amount of $20,000,000. This issue petitioner on July 2,1917, exchanged at par for $20,000,000 (the whole issue) of its Debenture Bonds issued in 1902 and for which it had received $18,800,000. On the date of the exchange, the unamortized discount on these debentures amounted to $871,921.26. This amount respondent deducted from the $20,000,000 par value of the second preferred stock and allowed the effective average of the remainder in invested capital for the remainder of the year. Petitioner contends that the effective average of the par value of the stock issued on July 2, 1917, should be included in invested capital for that year.
Under issue 29 petitioner asserts, apparently as an alternative, that it is entitled to include in invested capital for 1917 the sum of $421,924.38, representing the balance (after giving effect to $30,544.49 allowed by respondent) of £f| of the total unamortized discount on said Debenture Bonds as of December 31,193 6.
Invested capital consists, broadly speaking, of money or property paid in for capital stock and paid in and earned surplus. Petitioner insists that since its debentures were received in exchange for its stock, we should hold that they were paid in for capital stock and since as it asserts, there is no evidence in the record to the effect that these debentures were worth less than par, the result is that $20,000,000 in debentures was paid in for $20,000,000 stock, ,and, further, that we can not go behind the finding of the Public Utilities Commission of Illinois.
The facts as stipulated show that this exchange was made just after petitioner had emerged from a receivership caused by great financial stress and that it had defaulted in the payment of interest on these very obligations. It is of interest to note that in the copy of the petition for advice with respect to the acceptance of the offer *1039 of compromise made by the directors, filed with the .agreed statement of facts, it is stated that these debentures were selling on the market in June, 1916, at approximately $580 for each $1,000 debenture. Further, the “Plan of Reorganization” discloses that petitioner’s T per cent first preferred stock was to be sold at par for cash. It is reasonable to suppose that its 6 per cent second preferred stock was worth less than its 7 per cent first preferred, and therefore less was paid for the former. Aside from this, we are of opinion that all that was paid in for this stock was precisely the amount paid for the debentures, which was, $18,800,000. An illustration will suffice. If petitioner had issued its debentures on July 1,1917, instead of in 1902, could it be successfully contended that the amortized discount for the whole life of the debentures except one day was paid in for the stock ? The question answers itself. We are, therefore, of opinion that all that was paid in for the second preferred stock was $18,800,000, the amount paid in for the debentures.
We have yet before us the effect of these transactions on surplus. Petitioner has the right to have restored to surplus the unamortized part of the discount, subject to the limitations set forth under issue 22.
Respondent has, by affirmative plea, raised the questions of the taxation of unamortized premiums and the effect of such amortized premiums on invested capital. All bonds which were sold at a premium were issued prior to March 1,1913, and such premiums should not be amortized either for the purpose of taxation or invested capital. See Old Colony Railroad Co., sura.
Reviewed by the Board.

Judgment will 6e entered under Rule 60.

Teammell dissents on the questions of bond discounts and penalties.